02-07-299-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-07-00299-CV

 

 


 
 
 DaimlerChrysler Motors Company, LLC 
 
 
  
 
 
 APPELLANT
 AND APPELLEE
 
 
 
 
  
 V.
  
 
 
 
 
 Tommy J. Manuel, Tommy Manuel Auto Leasing, Inc.,
 and Manuel Auto Sales, Ltd. 
 
 
  
 
 
 APPELLEES
 AND APPELLANTS
 
 


 

 

----------

 

FROM THE 141st
District Court OF Tarrant COUNTY

----------

 

OPINION

----------

 

I. 
INTRODUCTION

          Following
a bench trial in this breach of contract case, the trial court rendered
judgment for damages against Appellant and Cross-Appellee DaimlerChrysler
Motors Company, LLC (Chrysler) and in favor of Appellees and Cross-Appellants
Tommy J. Manuel, Tommy Manuel Auto Leasing, Inc., and Manuel Auto Sales, Ltd.
(collectively, Manuel) but denied recovery of Manuel’s attorney’s fees.[1] 
In four issues, Chrysler contends (1) that the best efforts provision in its
contract with Manuel is unenforceable or that Chrysler conclusively proved that
it complied with the best efforts provision by ultimately settling a protest by
a competing dealer of Manuel’s application for a new dealership, (2) that
Manuel’s damages from delay in opening the new dealership are consequential
damages barred by limitation-of-damages provisions in the parties’ contracts, (3)
that the trial court abused its discretion by admitting unreliable expert
testimony regarding damages for lost profits, and (4) that the trial court
erred in calculating prejudgment interest.  In his cross-appeal, Manuel contends
that the trial court erred by failing to award him any trial and appellate attorney’s
fees.  We affirm in part and reverse and remand in part.

II. 
BACKGROUND[2]

           Chrysler
manufactures Chrysler, Dodge, Dodge Truck, and Jeep motor vehicles.  Tommy
Manuel has been a franchised automobile dealer in the Dallas-Fort Worth area
for forty-seven years, including twenty-five years as a franchised Chrysler and
Dodge dealer in Fort Worth and Richardson.  At the time of trial, Tommy Manuel
owned or controlled at least nine motor vehicle dealerships in the Dallas-Fort
Worth market.

A.  Historical
Backdrop

In
the mid-1990s, as number three of the “Big Three” in that day, Chrysler
developed a market realignment plan called “Project 2000” to reorganize,
relocate, and establish more motor vehicle dealerships to improve sales in the
Dallas-Fort Worth area and to better compete with its rivals, Ford and General
Motors.  As an essential part of Project 2000, Chrysler sought to have its
various Dallas-Fort Worth franchised dealers agree to waive their rights to
protest the establishment or relocation of other dealerships in the Dallas-Fort
Worth area.

          Texas
and other states closely regulate the distribution and sale of automobiles.  In
response to the superiority of economic power and bargaining strength of American
automobile manufacturers in their relationships with dealers that had developed
by the 1950s, with dealers completely dependent upon those manufacturers for
their supply of automobiles, Congress[3] and state legislatures
enacted regulatory schemes to protect retail dealers from perceived abusive and
oppressive acts by the manufacturers.[4] 
In accord with the policy of protecting dealers and consumers, the United
States Supreme Court upheld the constitutionality of a California statute that
prohibited manufacturers from relocating or adding new dealerships to their
market areas where the effect of such added competition would be injurious to existing
franchisees and to the public interest.[5]  The Court held that a
state may, consistent with due process, provide that the filing of a protest by an existing dealer can,
without a prior hearing, prevent another dealer from relocating or establishing
a new dealership in the existing dealer’s defined market area until after a
hearing and resolution of the protest.[6]

The
Texas Motor Vehicle Commission Code (TMVC), this State’s first regulation of
the motor vehicle manufacturer-dealer relationship, was adopted in 1971.[7]  The policy of the
TMVC, set forth in what is now section 2301.001 of the occupations code, is to
ensure a sound system of distribution and sale of motor vehicles for the protection
of the public interest and welfare of the citizens of Texas through exercise of
this State’s police power.[8]

The
TMVC, as do similar state statutory schemes like California’s, provides a
procedure by which an existing dealer may protest the establishment or
relocation of a dealership that will sell the same line or make of vehicles in
the same county or within fifteen miles of the existing dealership.[9]  The filing of a
notice of protest triggers an administrative proceeding requiring a hearing
before the Commission, in which the applicant for the new dealership has the
burden to establish “good cause” for establishing or relocating the dealership
at the proposed location.[10]  In the meantime, filing
of the notice effects an immediate statutory stay as to any action by the
applicant to establish or relocate the proposed new dealership or relocation
until the protest is resolved.[11]  Among its findings of
fact, the trial court found that a hearing and final resolution of the protest
could take years.  Complicating matters in this case, the TMVC provides that any
agreement waiving terms of the TMVC is void and unenforceable.[12]

B.  Project
2000

By
mid-July of 1999, after several years of efforts to obtain agreements for the
realignment of the Dallas-Fort Worth market from its various dealers in the
area, Chrysler had circulated and obtained settlement agreements, including waivers
of the right to protest, from each of the Dallas-Fort Worth area dealers participating
in Project 2000, with the exception of Manuel.  Manuel was aware of Chrysler’s
plan but was not originally a Project 2000 participant for several reasons.  Chrysler
had litigation pending against one of Manuel’s dealerships (and other
dealerships in Texas and California) for allegedly seeking fraudulent warranty
credits from Chrysler for engine cores (the Cores litigation), and
Manuel had a protest against Chrysler pending before the Commission arising out
of the Cores litigation.  Additionally, Manuel had bought and operated for
twenty-five years a successful dealership in Richardson with a “trip,” that is,
three lines―Chrysler, Dodge car, and Dodge truck.  Chrysler had been
trying to buy the Chrysler line from Manuel for many years, and he had refused
to sell it. Chrysler desired the Chrysler line to keep Manuel from protesting
other dealers in that market area as well as to give that “point” to another
dealer to complete the Project 2000 market realignment.  Chrysler approached
Manuel last regarding Project 2000 because it knew that Manuel would be the
most expensive to deal with.  Joe Park, Chrysler’s Dallas zone manager at the
time, recalled at trial, “We had to get him out of the way.”

In mid-August
1999, during a meeting of Dodge truck dealers in San Antonio, Chrysler representatives
from Detroit and the Dallas zone office met with Manuel about joining Project
2000, and the parties proceeded to negotiate.  Chrysler offered Manuel $5
million for his Chrysler line at the Richardson dealership, and Manuel bargained
for $15 million and another dealership to replace it.  The parties discussed
possible locations for an additional dealership, and Park told Manuel that the
other dealers had signed waivers of the right to protest relocations or
additional dealerships in joining Project 2000.  By the end of August 1999, the
two parties had arrived at a comprehensive agreement.

C.  The
Agreements

          Manuel
signed two written agreements dated August 31, 1999, after reviewing them with
his attorney (who had represented him in the Cores litigation).  One was
a settlement and release agreement (the Settlement Agreement) similar to those
entered into with the other dealers participating in Project 2000.  Pursuant to
the Settlement Agreement, Chrysler paid Manuel $15.34 million to settle the Cores
litigation, to relinquish the Chrysler line at his Richardson dealership,
and to waive any right to protest the other dealers involved in Project 2000.  The
second agreement, attached to and referenced in the Settlement Agreement, was titled
“Agreement to Enter into Sales and Service Agreement” (the AESSA).  By the
AESSA, Chrysler agreed to enter into a franchise agreement with Manuel for a
new Chrysler-Jeep dealership in South Arlington (the South Arlington
dealership), conditioned upon Manuel providing the land, building the facility,
and furnishing the capital investment for the new dealership by January 1,
2001.

The
Settlement Agreement stated that the South Arlington dealership was “subject to
the possibility that it may be protested” by another dealer and that a protest
“can significantly delay the establishment or relocation of the dealership
subject to the protest.”  The AESSA in turn provided that, in the event of a
protest against the South Arlington dealership, Chrysler would “use its best
efforts to litigate or settle the protest or lawsuit in order to allow the
establishment of [the South Arlington] dealership.”

Pursuant
to the terms of the Settlement Agreement, Manuel ceased selling Chrysler
vehicles at his Richardson dealership within thirty days after the agreements
were signed in August 1999.  As required by the AESSA, Manuel created a new
corporation (Tommy Manuel Chrysler-Jeep, Inc.) and filed his application with
the Commission for the new dealership in South Arlington in December, which was
approved on January 14, 2000.  Manuel purchased property for the South
Arlington dealership in April 2000.

D.  Meador’s
Protest

On
January 28, 2000, Meador Chrysler-Plymouth, Inc. (Meador), one of the other dealerships
that was part of Project 2000 and whose dealer-principal had signed a protest
waiver, filed a notice of protest against the creation of the South Arlington dealership,
which would be located less than fifteen miles from Meador’s existing
dealership.  The filing of Meador’s protest was unexpected by both Manuel and
Chrysler, and it triggered the statutory stay of Manuel’s attempts to open the
South Arlington dealership.

Chrysler’s
zone manager and other representatives met with Mr. Meador and his business
associate on a number of occasions, requesting that Meador withdraw its
protest.  Chrysler moved to have the protest dismissed by the Commission,
acting as Meador’s attorney-in-fact as provided by Meador’s settlement
agreement.  Failing that effort, on March 31, 2000, Chrysler filed suit in federal
district court in the Western District of Texas, obtained a stay of the
administrative proceeding, and sought injunctive relief and to compel
arbitration of the issues raised by Meador’s protest.  The federal court initially
stayed the state administrative proceeding but, after a hearing, denied all relief
on June 7, 2000, abated the suit in its own court, and returned the protest to
the Commission for resolution.  Chrysler then sought and obtained permission to
file an interlocutory appeal of the adverse ruling and intervened in the
administrative proceeding before the Commission.  In July 2000, Chrysler filed
its appeal to the Fifth Circuit Court of Appeals from the federal district
court’s adverse decision. Also in July of 2000, pursuant to a strategy agreed upon
at a meeting between Manuel and Chrysler and their respective attorneys, Manuel
filed a separate suit in state court against Meador for damages resulting from the
delay of the establishment of his new dealership caused by Meador’s protest.

          In
September 2000, some eight months after the protest had been filed, Chrysler had
intensive settlement negotiations with Meador.  Chrysler ultimately settled the
Meador protest in October 2000 by giving Meador a letter of intent for an
additional dealership and paying Meador $17,000 in attorney’s fees.  In
November 2000, Chrysler advised Manuel to proceed with building his facility
for the new dealership in South Arlington, and the Meador protest was formally dismissed
on December 21, 2000.

E.  This
Suit

          It
was undisputed that the years 2000 and 2001 were exceptionally good years for
car sales in the Dallas-Fort Worth market, but Manuel was not able to complete
and open the South Arlington dealership until February 2002.  A significant
downturn in sales and a steep decline of the American market share of
automobiles began in 2002.  They were continuing at the time of trial, and the
new dealership sustained a loss for 2002 and subsequent years.

In
2004, Manuel sued Chrysler for breach of contract and other causes of action,
seeking damages caused by the delay in opening the South Arlington dealership
as the result of Chrysler’s failure to resolve Meador’s protest, the costs
Manuel incurred in litigating Meador’s protest before the state agency and in
state court, and attorney’s fees.  Manuel contended that Chrysler failed to use
its best efforts as required by the AESSA to litigate or settle the Meador
protest, thereby causing the delay in the opening of the South Arlington
dealership.

          The
trial court granted summary judgments to Chrysler on most of Manuel’s causes of
action, including breach of contract, but on the morning of trial on damages, the
trial judge announced during opening statements that he would hear evidence
regarding breach of the best efforts clause by Chrysler.  The parties tried the
case to the bench over a sporadic period of about six weeks regarding that
issue and damages.  Among its findings of fact, the trial court found that
Chrysler failed to use its best efforts to resolve the Meador protest and that
Chrysler “breached the contract.”[13]  The trial court rendered
a final judgment awarding Manuel $370,668.50 in damages plus prejudgment interest
but denied Manuel recovery of attorney’s fees.  Both parties appealed.  Chrysler
seeks reversal of the trial court’s judgment and rendition of a take-nothing
judgment, and Manuel seeks remand for a new trial on the issue of attorney’s
fees.

III. 
BEST EFFORTS

By
its first issue, Chrysler argues that the AESSA’s best efforts clause is
unenforceable because it lacks measurable goals and guidelines and that even if
the best efforts clause is enforceable, the goal of the agreement was the
opening of the South Arlington dealership, meaning best efforts are irrelevant
because that goal was ultimately met.  Chrysler alternatively contends that the
evidence conclusively established that Chrysler used its best efforts to
resolve the Meador protest.[14]

A.  Enforceability
of “Best Efforts” Clause

          1.
 Standard of Review

When
a contract is unambiguous, interpretation of the written instrument is a
question of law for the court.  MCI Telecomm. Corp. v. Tex. Util.
Elec. Co., 995 S.W.2d 647, 650B51
(Tex. 1999) (citing Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)); see
Heil Co. v. Polar Corp., 191 S.W.3d 805, 809B10
(Tex. App.— Fort Worth 2006, pet. denied) (“The interpretation of an
unambiguous contract is a question of law, which we review de novo.”).  More
specifically, the enforceability of a contract is a legal issue that we review
de novo.  See Elijah Ragira/VIP Lodging Grp., Inc. v. VIP Lodging Grp., Inc.,
301 S.W.3d 747, 754 (Tex. App.—El Paso 2009, pet. denied); Chavez v. McNeely,
287 S.W.3d 840, 843–44 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

2.  Goals
and guidelines

Chrysler
first argues that “best efforts” is a vague standard that is rarely held
enforceable.  But Chrysler’s own general counsel and legal department drafted
the settlement agreements and AESSAs used to implement Project 2000. Moreover,
and to the contrary, courts enforce contractual best efforts clauses in a wide
variety of circumstances.  See E. Farnsworth, Farnsworth on Contracts
'
7.17c (2d ed. 2001) (stating it is no longer the case that “a duty defined only
in terms of best efforts” is too indefinite to be enforceable) (citations omitted);
Kenneth A. Adams, Understanding “Best Efforts” and Its Variants (Including
Drafting Recommendations), 50 No. 4 Practical Lawyer, Aug. 2004, at 17
(noting courts in most jurisdictions have held best efforts clauses
enforceable).  “Whatever the test of best efforts, there is no question but
that courts today regard the standard of best efforts—like that of good faith—as
a workable standard in a variety of circumstances.”  E. Farnsworth, On
Trying to Keep One’s Promises: The Duty of Best Efforts in Contract Law, 46
U. Pitt. L. Rev. 1, 12 (1984).

Courts
construing a best efforts provision that does not specify the performance to be
required commonly hold the promisor to the standard of the diligence a
reasonable person would use under the circumstances.  See, e.g., CKB &
Assocs., Inc. v. Moore McCormack Petroleum, Inc., 809 S.W.2d 577, 578 (Tex.
App.—Dallas 1991, writ denied) (op. on reh’g) (comparing performance of best
efforts with that of average prudent operator in light of circumstances of
case); see also Bloor v. Falstaff Brewing Corp., 601 F.2d 609,
614–15 (2d Cir. 1979) (holding licensor could not treat licensee=s
brands less favorably than its own); Van Valkenburgh, Nooger & Neville,
Inc. v. Hayden Publ’g Co., 281 N.E.2d 142, 144 (1972) (holding publisher
who promised best efforts to promote author’s book not restricted from also
promoting competing series); Farnsworth, 46 U. Pitt. L. Rev. at 7–8 (“Best
efforts is a standard that has diligence as its essence . . . .”).

Chrysler,
quoting from the Dallas court of appeals opinion in CKB, specifically complains
that the best efforts clause in this case lacks measurable goals and guidelines. 
809 S.W.2d at 580.  In that case, CKB had agreed to use its best efforts to
refine crude oil into specific volumes of refined products, as set out in the
agreement in a schedule specifying percentages of total refinery output for
each product.  Id. at 578.  Instead of refining the crude oil to produce
the quantities specified in the contract, CKB operated the refinery to produce
the highest dollar yield on the crude.  Id. at 579, 582.  Moore
McCormack sued CKB for breach of contract, and the trial court rendered summary
judgment in Moore McCormack=s favor.  Id. at 580. 
CKB appealed.  Id.

As
Chrysler points out, the CKB court described the provision for “best
efforts” in a contract as Aa nebulous standard. . . . Under
some circumstances, a party could use best efforts to achieve a contractual
goal and fall well short.  Under different circumstances, an effort well short
of one=s
best may suffice to hit a target.@  See
id. at 581.  Thus, that court reasoned, “To be enforceable, a best efforts
contract must set some kind of goal or guideline against which best efforts may
be measured.@  Id. at 581–82 (citing Pinnacle
Books, Inc. v. Harlequin Enters., 519 F. Supp. 118, 121 (S.D.N.Y. 1981)).  The
court concluded that when sufficient guidelines exist, a party that performs
within the guidelines fulfills the contract regardless of the quality of its
efforts.  Id. at 582.  Only when a party misses the guidelines would a
court measure the quality of its efforts “by the circumstances of the case . .
. and by comparing the party’s performance with that of an average, prudent,
comparable operator.”  Id. (citing Bloor, 601 F.2d at 613–14; Pinnacle,
519 F. Supp. at 122; Arnold Prods., Inc. v. Favorite Films Corp., 176 F.
Supp. 862, 866 (S.D.N.Y. 1959)).  Ultimately, the court affirmed the summary
judgment against CKB because it concluded that CKB made no efforts to
meet the production standards specified in the contract, stating:  “As a matter
of law, no efforts cannot be best efforts.”  Id. (citing Bloor,
601 F.2d at 613B14).[15] 
Thus, the CKB court did not further explore the “goal or guideline”
standard.

Chrysler
argues that the best efforts clause in the AESSA is unenforceable because it
fails to set forth a measurable goal or guideline in that no date was specified
by which Chrysler was required to litigate or settle the Meador protest. Manuel
responds that, reading the contract as a whole, the AESSA required Chrysler to
settle or litigate the Meador protest in a manner that allowed Manuel to open
the South Arlington dealership on or before January 1, 2001.  Manuel references
language in the AESSA stating that he was required to build and complete the
facilities for the South Arlington dealership before January 1, 2001, that the
establishment of the South Arlington dealership was of “major importance” to
Chrysler, and that “time is of the essence.”

In Herrmann
Holdings, Ltd. v. Lucent Technologies, Inc., the contract required Lucent
to use its “reasonable best efforts” to file registration paperwork with the
Securities and Exchange Commission (SEC) “as promptly as practicable” or “in
the most expeditious manner practicable.”  302 F.3d 552, 556 (5th Cir. 2002). 
Rejecting the very argument by Lucent that Chrysler makes here, the Fifth
Circuit Court of Appeals held that Herrmann Holdings’s pleadings stated a claim
for breach of contract, significantly stating that “[r]equiring contracting parties
to fix a date certain in order to set a temporal guideline in
which to complete a certain task demands more definiteness than Texas law
requires.”  Id. at 560 (emphasis added).

Here,
the best efforts provision states:  “[Chrysler] will use its best efforts to
litigate or settle the protest or lawsuit in order to allow the establishment
of [the South Arlington] dealership.”  The best efforts provision does not
include language similar to the “as promptly as practicable” or “in the most
expeditious manner practicable” language in Herrmann Holdings, but the
AESSA does specifically and expressly contemplate establishing the South
Arlington dealership by January 1, 2001.[16]  Even absent such
language, we cannot interpret the best efforts provision as placing no deadline
at all for Chrysler to litigate or settle the Meador protest because doing so
reads the January 1, 2001 deadline out of the AESSA and renders the best
efforts clause itself meaningless.  See id.  Rather, the goal or
objective of the best efforts provision in the AESSA, in light of the agreement
as a whole, was for Chrysler to use its best efforts to litigate or settle the
Meador protest in such a period of time that Manuel could establish the South
Arlington dealership by January 1, 2001.

Moreover,
other courts have held enforceable “best efforts” requirements in contracts
that contained none of the defining language in Herrmann Holdings. 
See, e.g., First Union Nat’l Bank v. Steele Software Sys. Corp., 838 A.2d
404, 428–29, 433, 448 (Md. App. 2003) (holding “best efforts” is a standard in
and of itself and is therefore enforceable, noting that even where “best
efforts” is not defined it is “a standard that has diligence as its essence”
and a term that “takes its meaning from the circumstances”); see also Coady
Corp. v. Toyota Motor Dist., Inc., 361 F.3d 50, 59 (1st Cir. 2004) (“’Best
efforts’ is implicitly qualified by a reasonableness test—it cannot mean
everything possible under the sun.”) (citing Macksey v. Egan, 633 N.E.2d
408, 413 & n.16 (Mass. App. Ct. 1994)); Baron Fin. Corp. v. Natanzon,
509 F. Supp. 2d 501, 513–14 (D. Md. 2007) (applying Maryland law and holding
best efforts clause enforceable and defined in terms of reasonableness highly
dependent upon surrounding circumstances); Mark P. Gergen, The Use of Open
Terms in Contract, 92 Columbia L. Rev. 997, 1000 (1992) (“Best efforts
clauses and other terms that require a party to use reasonable diligence in
performance are obviously like a negligence rule.”).

This
is in accord with the well-established rule that, where a contract does not fix
the time for performance (which is Chrysler’s specific complaint about the
AESSA), it will be presumed that the agreement is to be performed within a
reasonable time.  Hewlett-Packard Co. v. Benchmark Elecs., Inc., 142
S.W.3d 554, 563 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); CherCo
Props., Inc. v. Law, Snakard & Gambill, P.C., 985 S.W.2d 262, 266 (Tex.
App.—Fort Worth 1999, no pet.).  What is a reasonable time depends upon the
facts and circumstances as they existed at the time the contract was formed.  CherCo
Props., Inc., 985 S.W.2d at 266.  Therefore, even if the January 1, 2001 date
specified in the AESSA for opening the new dealership were not controlling (and
it is undisputed that the protest was not resolved in time for Manuel to build
his facility and open for more than a year after that date), we hold that the
best efforts provision in the AESSA had a measurable timeline or goal of
resolving any protest by settlement or litigation within a reasonable time and
was thus enforceable.  We overrule the first part of Chrysler’s first issue.

B.  
The Quality of Chrysler’s Efforts 

Chrysler
next argues that, even if the best efforts clause is enforceable, the AESSA’s
only goal was the opening of the South Arlington dealership and that because
Chrysler’s efforts eventually settled the protest, it met the goal because the
South Arlington dealership eventually opened.  Thus, Chrysler, citing Herrmann
Holdings, 302 F.3d at 559, argues that the “analysis ends” and that whether
Chrysler used its best efforts is irrelevant.  But the Fifth Circuit’s opinion
in Herrmann Holdings is again instructive in rejecting this argument. 
In that case, Lucent eventually filed the registration paperwork with
the SEC, and the SEC approved the transaction.  Id. at 557.  But by that
time, the Herrmanns had been damaged by the decline in Lucent’s stock price.  Id. 
The Fifth Circuit held that the Herrmanns had stated a plausible claim for
breach of the best efforts clause; in other words, that Lucent eventually filed
the paperwork and that the SEC eventually approved the transaction did not
negate as a matter of law the allegations of a breach by Lucent of the best
efforts clause.  Id. at 561.

The
goal of the contract here—a goal Chrysler itself identified as having major
importance—was not just opening the South Arlington dealership someday, but opening
the dealership by January 1, 2001.  Using the CKB analysis, we consider
the “performance . . . of an average, prudent, comparable operator” under the
circumstances of the case to determine the quality of Chrysler’s performance.  See
 809 S.W.2d at 582.  We conclude that, even absent a date certain by which
Chrysler was obligated to litigate or settle the protest, the fact that Chrysler
eventually settled the Meador protest so that the South Arlington dealership opened
a year later than contemplated does not establish as a matter of law that
Chrysler met the goal.  We overrule this part of Chrysler’s first issue.

C. 
Legally Sufficient Evidence of Breach of Best Efforts Clause

In
the final part of its first issue, Chrysler argues that, even if it missed the
goal of timely resolving the protest, the evidence nevertheless conclusively
establishes that it used its best efforts.  Manuel responds that, under the
evidence, that issue was one of fact that was properly resolved against
Chrysler by the trial court as fact finder.

1.  Standard
of Review

We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334
(Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, “No
Evidence” and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361,
362–63 (1960).  In determining whether there is legally sufficient evidence to
support the finding under review, we must consider evidence favorable to the
finding if a reasonable factfinder could and disregard evidence contrary to the
finding unless a reasonable factfinder could not.  Cent. Ready Mix Concrete
Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).

Findings
of fact entered in a case tried to the court have the same force and dignity as
a jury=s
answers to jury questions.  Anderson v. City of Seven Points, 806 S.W.2d
791, 794 (Tex. 1991).  The trial court=s
findings of fact are reviewable for legal sufficiency of the evidence to
support them by the same standards that are applied in reviewing evidence
supporting a jury=s answer.  Ortiz v.
Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel, 881
S.W.2d 295, 297 (Tex. 1994).

Whether
a contractual best efforts obligation has been met or fulfilled is usually a
question of fact because it is heavily dependent upon the particular
circumstances of the case.  See, e.g., Mor-Cor Packaging Prods., Inc. v.
Innovative Packaging Corp., 328 F.3d 331, 334 (7th Cir. 2003)
(Posner, J.) (characterizing best efforts as a standard in and of itself and
stating whether standard is met is question of fact involving “the application
of a standard, ‘best efforts,’ to the particular facts of the case”); Informed
Physician Servs., Inc. v. Blue Cross and Blue Shield of Md., Inc.,
711 A.2d 1330, 1342 (Md. 1998) (confirming that what constitutes reasonable
efforts is largely a question of fact); Widewaters Prop. Dev. Co. v. Katz,
836 N.Y.S.2d 746, 748 (N.Y. App. Div. 2007) (noting that whether the obligation
to use best efforts
has been fulfilled will
almost invariably involve an issue of fact);
First Union Nat’l Bank, 838 A.2d at 428 (stating that factual
determination may be required as to whether party used best efforts).

2.  Analysis

Chrysler
argues that the AESSA did not obligate it to pay any money to Meador and urges
that its other efforts to resolve Meador’s protest were Areasonable
and prudent@ in settling the protest within nine
months.  Chrysler points to evidence that its zone manager Joe Park (1) met
with Meador’s co-owner and sales manager (because Mr. Meador was ill and
unavailable) soon after Meador filed its protest and urged withdrawal of the
protest; (2) remained in constant contact with them; (3) later talked to Mr. Meador,
who would not overrule his co-owner’s answer of “no”; and (4) finally reminded Meador’s
representatives that Meador’s protest was a breach of Meador’s own contractual
agreement not to protest other relocations or new dealerships in Project 2000.  But
Park never offered money to Meador to withdraw its protest because he did not
think he needed to since Meador had signed a contract.  Park also testified
that he did not think Meador wanted money and instead wanted to delay Manuel’s dealership
as long as possible.  Chrysler thus continued on its litigation path, seeking to
have the administrative protest dismissed, obtaining a stay of those
proceedings, and filing suit in federal court against Meador for an injunction
and to compel arbitration regarding the validity of the protest.

In CKB,
the Dallas court of appeals stated that “[w]hen a party misses the guidelines,
courts measure the quality of its efforts by the circumstances of the case and
by comparing the party’s performance with that of an average, prudent,
comparable operator.”  809 S.W.2d at 582 (citations omitted).  While there is
evidence of the circumstances surrounding Meador’s protest, of Chrysler’s
efforts to have Meador withdraw that protest (which Chrysler refers to as
evidence of efforts to settle), and of Chrysler’s eventual settlement of the
protest, the evidence is undisputed that Chrysler and Meador did not exchange
settlement proposals until September 2000 and that they did not reach a
settlement until October 4, 2000.

The
trial court could have reasonably inferred that Chrysler wanted to “clear the
market” for all of the dealerships participating in Project 2000 and that Chrysler’s
strategy was, in effect, to remove the protest waiver issue to federal court and
seek arbitration to avoid a determination of that issue by the Commission under
the Texas regulatory scheme (which is not to say that such a strategy was
unreasonable per se).  The federal district court denied injunctive relief and Chrysler’s
motion to compel arbitration on June 7, 2000, and issued an eleven-page order explaining
the reasons, including that the validity of the protest waiver under the terms
of the TMVC was more appropriately for the agency to decide and that Manuel was
not a party and would not be bound by an arbitration award or a decision from
the federal court.  See DaimlerChrysler Motors Corp. v. Meador
Chrysler-Plymouth, Inc., No. A-00-CA-216-SS, at *10–11 (W. Dist. Tex. June
7, 2000).  Hence the federal court abated the suit in its own court and returned
the issue to the administrative agency for decision.  Id.[17]
 At least by that point, as the trial court in this case noted during closing
arguments, Chrysler must have had “some understanding” of the unlikelihood of
success with its litigation efforts.  Yet Chrysler still did nothing to settle
for several more months.  During that time, Chrysler pursued its interlocutory
appeal to the Fifth Circuit Court of Appeals and strategized with Manuel to
coordinate his filing suit in state court against Meador, all of which only further
delayed the resolution of the Meador protest.  After settling with Meador in
October 2000, Chrysler notified Manuel that he could proceed with building his
facility in November 2000, and the protest was formally dismissed in December
2000.  By that time, all of the other Project 2000 dealers in the area were
selling cars.  But Manuel was unable to begin building his new dealership
facility by reason of the pending protest until after the settlement and,
consequently, was not able to open for business until February 2002.

What
would a prudent, comparable automobile manufacturer have done?  As was acknowledged
by the parties in the Settlement Agreement, Chrysler and Manuel both knew from
the outset that a protest could entail significant delay, and Chrysler knew
that a protest by any dealer participating in Project 2000 would present a
significant obstacle to the accomplishment of its planned market realignment.  The
testimony was undisputed that Chrysler had planned all along to pay dealers for
their agreement not to protest for that very reason and had budgeted $50
million toward preventing or resolving protests such as that filed by Meador in
order to implement Project 2000 in the Dallas-Fort Worth area. Chrysler budgeted
$11.2 million to pay another dealer for a protest waiver but ended up paying
that dealer $1 million and giving him a new point (a new dealership), and Chrysler
paid $1 million to another dealer who was not a Project 2000 participant in
order to settle a threatened protest within a few days after that dealer
approached Chrysler.

          Although
Chrysler offered evidence that Meador only wanted to delay Manuel’s new
dealership as long as possible, there was contradictory evidence that Meador might
have been interested in a settlement and that it wanted a “point”.  Chrysler
had two open points and a substantial remaining budget of around $30 million
after payments to Manuel and other dealers but did not offer either money or a
point to Meador until late September 2000, so there is no way to know what
Meador would have accepted at an earlier date.  And Chrysler=s
witnesses were unable to explain why Chrysler never offered any of its multi-million
dollar budget to settle the Meador protest.

          Chrysler
argues that the AESSA did not obligate it to pay any money to Meador, that it
had no contractual obligation to use the $50 million it had allocated to its
budget to settle protests by dealers, and that it could simply have “ignored”
settling with Meador until it had fully litigated its pending federal court and
administrative proceedings.  Chrysler reasons that Manuel’s position (and the
trial court’s finding of failure to use best efforts) imposed “an additional
burden” on Chrysler of settlement.  Chrysler argues that its choice to litigate
rather than settle was solely within its discretion under the AESSA,
that it was entitled to exercise its legal right to enforce Meador’s agreement
to waive the statutory right to protest, and that there was no prohibition in
either the AESSA or the Settlement Agreement against Chrysler trying to hold
Meador to its agreement.  According to Chrysler, punishing it for choosing to
pursue litigation rather than to settle would strip Chrysler of its right to
access to the courts to enforce its rights.

          By
all of these arguments, Chrysler overlooks its agreement in the AESSA that contractually
obligated it to use its best efforts not simply to litigate but “to litigate or
settle the protest or lawsuit in order to allow the establishment of the
South Arlington dealership.” [Emphasis added].  The question is not whether
Chrysler should have litigated, as we agree that was its right.  Rather, the
question is when did Chrysler’s choice to litigate to the exclusion of
making any efforts toward settlement become unreasonable.  See CKB, 809
S.W.2d at 582 (stating that when a party fails to meet goal or guideline, court
measures quality of its efforts by circumstances and comparison of performance
of the prudent comparable operator); see also Herrmann Holdings,
302 F.3d at 559 (stating court may look to circumstances of case and compare
party’s performance in similar cases in determining whether party failed to
exercise best efforts).

According
to a letter from Manuel’s counsel, Chrysler assured Manuel in mid-June 2000 that
it was going to dismiss the federal appeal and attempt to settle with Meador
while Manuel filed suit and litigated against Meador in state court.  Although Manuel
did file and litigate that suit, Chrysler still made no effort to settle with
Meador until late September.  As held by the court in CKB, “[N]o efforts
cannot be best efforts.”  See 809 S.W.2d at 582.

Applying
the appropriate standard of review, we hold that there is legally sufficient
evidence to support the trial court=s
finding that Chrysler breached the best efforts provision in the AESSA.  See
Cent. Ready Mix Concrete, 228 S.W.3d at 651; City of Keller, 168
S.W.3d at 807, 827; see also Martinez, 977 S.W.2d at 334.  We overrule
the remainder of Chrysler’s first issue. 

IV. 
LIMITATION OF DAMAGES

By
its second issue, Chrysler contends that the trial court erred by awarding
Manual damages of $370,668.50 based upon Manuel’s claim for lost profits for
the one-year period during which Manuel was not able to open the South
Arlington dealership.  Chrysler relies upon the AESSA’s limitation-of-damages
provision, which limits recoverable damages solely to “out-of-pocket expenses
that cannot be mitigated,” and argues that Manual is barred from recovering
lost profits as damages by waiver of “incidental and consequential damages” in
both the AESSA and the Settlement Agreement.[18]  Chrysler complains that
the trial court erred as a matter of law in disregarding these contractual
limitations of damages.  Alternatively, Chrysler contends that, if the trial
court concluded that the limitation of damages provisions were ambiguous, there
is no evidence to support the trial court’s finding of fact that the parties’
intent was to allow recovery of “actual damages” under the Settlement
Agreement.

A. 
Preservation of Error

Manuel
first asks us to summarily overrule Chrysler’s second issue because Chrysler
failed to negate every basis supporting the judgment. Specifically, Manuel
argues that Chrysler only challenges “lost profits” but that the trial court could
have rested its damage award on Manuel’s individual claims for lost salary and
rental income for which there is evidence and which Manuel asserts are
independent grounds not challenged on appeal.

Rule
of appellate procedure 38.1(f) provides that “[t]he statement of an issue or
point will be treated as covering every subsidiary question that is fairly
included.”  Tex. R. App. P. 38.1(f).  In this regard, the Supreme Court of
Texas has stated that “disposing of appeals for harmless procedural defects is
disfavored”; that appellate courts are to construe appellate briefs “reasonably,
yet liberally, so that the right to appellate review is not lost by waiver”;
and that “appellate courts should reach the merits of an appeal whenever
reasonably possible.”  Perry v. Cohen, 272 S.W.3d 585, 587 (Tex. 2008).

While
Chrysler’s second issue discusses the damages awarded in short-hand form as “lost
profits,” Chrysler’s overarching contention is that the limitation-of-damages
clause of the AESSA limits Manuel’s damages to out-of-pocket expenses that
cannot be mitigated.[19]  None of Manuel’s damage
claims—whether for lost profits, lost owner’s salary, or lost rental income—are
for out-of-pocket expenses; each claim seeks recovery of benefit-of-the-bargain
damages as if the contract had been performed.  See Bechtel Corp. v. Citgo
Prods. Pipeline Co., 271 S.W.3d 898, 927 (Tex. App.—Austin 2008, no pet.)
(stating that expectation damages are designed to award the claimant “the
benefit of his bargain by being put in as good a position as he would have been
had the contract or promise been performed”).

Whether
Manuel may recover any damages (which would include lost profits, lost
salary, and lost rentals) other than out-of-pocket expenses is fairly included
within Chrysler’s second issue; lost owner’s salary and rental income are not
independent, unchallenged grounds supporting the trial court’s judgment.  See
Tex. R. App. P. 38.1(f); Perry, 272 S.W.3d at 586–87; cf. Reliford v.
BNSF Ry. Co., No. 02-09-00322-CV, 2011 WL 255795, at *1 (Tex. App.—Fort
Worth Jan. 27, 2011, no pet.) (mem. op.) (holding appellant failed to challenge
each independent ground supporting judgment because jury found statute of
limitations barred claim and appellant only complained of charge error on his
affirmative cause of action).  Thus, we will address the merits of Chrysler’s
second issue.

B. 
Applicable Law

          Included
within the resolution of Chrysler’s second issue are legal determinations
relating to the interpretation of contracts, the consideration of separate
writings together, ambiguity, and the differences between direct and consequential
damages for breach of contract. 

          1. 
Rules of Interpretation and Contract Construction

          Interpretation
of an unambiguous contract is a question of law for the court to decide de
novo.  Coker, 650 S.W.2d at 393.  Our primary concern in construing
a written contract is to ascertain the objective intent of the parties as
expressed in the contract.  Id.; City of the Colony v. N. Tex. Mun.
Water Dist., 272 S.W.3d 699, 722 (Tex. App.—Fort Worth 2008, pet. dismissed). 
We examine and consider the entire document in an effort to harmonize and give
effect to all provisions of the contract so that none will be rendered
meaningless.  Seagull Energy E & P, Inc. v. Eland Energy, Inc., 207
S.W.3d 342, 345 (Tex. 2006); Coker, 650 S.W.2d at 393; City of the
Colony, 272 S.W.3d at 722.

          We
examine all parts of the agreement in light of the circumstances surrounding
the formation of the contract.  Columbia Gas Transmission Corp. v. New Ulm
Gas, Ltd., 940 S.W.2d 587, 591 (Tex. 1996).  Instruments pertaining to the
same subject matter must be considered together to ascertain the intent of the
parties.  In re Prudential Ins. Co., 148 S.W.3d 124, 135 (Tex.
2004) (orig. proceeding); see City of Keller, 168 S.W.3d at 811 (even
writings executed at different times must be considered together if they
pertain to the same transaction); DeWitt County Elec. Co-op., Inc. v. Parks,
1 S.W.3d 96, 102 (Tex. 1999).  We view the contracts “from a utilitarian
standpoint bearing in mind the particular business activity sought to be served.” 
Frost Nat’l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310, 312 (Tex.
2005) (quoting Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 530 (Tex.
1987)); Clark v. Cotten Schmidt, L.L.P., 327 S.W.3d 765, 772 (Tex. App.—Fort
Worth 2010, no pet.). 

          Whether
a contract is ambiguous is a question of law for the court.  J.M. Davidson,
Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003).  Lack of clarity does not
create an ambiguity, and a contract is not ambiguous merely because the parties
advance conflicting interpretations.  Id.; City of the Colony, 272
S.W.3d at 722.  We determine whether a contract is ambiguous by considering the
contract as a whole in light of the circumstances present when the parties
entered into it.  Universal Health Servs., Inc. v. Renaissance Women’s Grp.,
P.A., 121 S.W.3d 742, 746 (Tex. 2003).  The trial court should
ascertain the objective intent of the parties as expressed in the writing
itself.  Sun Oil Co. v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981).  A
contract is ambiguous when its meaning remains uncertain or subject to more
than one reasonable interpretation after it is subjected to applicable rules of
interpretation.  Frost Nat’l Bank, 165 S.W.3d at 312; Coker, 650
S.W.2d at 393–94.  It is only after a determination by the trial court that the
contract is in fact ambiguous that parol evidence becomes admissible, and then
only to assist the fact finder in determining what the subjective intent of the
parties was at the time they entered into the contract.  See Sun Oil Co.,
626 S.W.2d at 731; see also Coker, 650 S.W.2d at 395.

          2. 
Law on Contract Damages

Because
the agreements do not define the terms “actual damages” or “consequential
damages,” we presume that the parties intended their ordinary meanings.  Cherokee
Cnty. Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade, 305 S.W.3d 309,
314 (Tex. App.—Houston [14th Dist.] 2009, no pet.).  The trial court found, and
neither party disagrees, that the AESSA did not involve the sale of goods or
services.  Therefore, we will apply common-law definitions rather than those set
forth in Article 2 of the UCC.  See id. (holding supply contract for
purchase of natural gas to operate cogeneration facility not a contract for
sale of goods and thus applying common law rather than UCC definition of consequential
damages); Wade & Sons, Inc. v. Am. Standard, Inc., 127 S.W.3d
814, 823 (Tex. App.―San Antonio 2003, pet. denied) (noting different
definitions used for direct and consequential damages under Texas common law
and as Texas courts have interpreted the UCC).

At
common law, the term “actual damages” encompasses both “direct” and “consequential”
damages.  Arthur Andersen & Co. v. Perry Equip. Corp., 945
S.W.2d 812, 816 (Tex. 1997); Henry S. Miller Co. v. Bynum, 836 S.W.2d
160, 163 (Tex. 1992) (Phillips, C.J., concurring).  “Direct damages,” also
known as “general damages,” are those inherent in the nature of the breach of
the obligation between the parties, and they compensate a plaintiff for a loss that
is conclusively presumed to have been foreseen by the defendant as a usual and
necessary consequence of the defendant’s act.  Arthur Anderson & Co., 945
S.W.2d at 816; Cherokee Cnty., 305 S.W.3d at 314.  One measure of
direct damages is the “benefit of the bargain” measure, which utilizes an
expectancy theory and evaluates the difference between the value as represented
and the value received.  See Mood v. Kronos Prods., Inc., 245 S.W.3d 8,
12 (Tex. App.—Dallas 2007, pet. denied) (generally, measure of damages for
breach is that which restores injured party to position he would have had if
contract had been performed); Frost Nat’l Bank v. Heafner, 12 S.W.3d
104, 111 n.5 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (citing Henry
S. Miller, 836 S.W.2d at 163).

“Consequential
damages,” also referred to as “special damages,” are those said to result
naturally but not necessarily from the wrongful act because they require the
existence of some other fact beyond the relationship of the parties.  Arthur
Andersen, 945 S.W.2d at 816 (consequential damages not necessarily
referable to the breach, but the loss must still have been reasonably
foreseeable or within the contemplation of the parties); Henry S. Miller, 836
S.W.2d at 163; Cherokee Cnty., 305 S.W.3d at 313–14; Tenn. Gas
Pipeline Co. v. Technip USA Corp., No. 01-06-00535-CV, 2008 WL 3876141, at
*8–9 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (mem. op.) (op. on
reh’g).

          Damages
that might be considered “consequential” in one contract may be direct damages
in another.  As Judge Cardozo wrote many years ago, the distinction between
direct and consequential damages under the common law is not absolute:  “There
is need to keep in mind that the distinction is not absolute, but relative.  To
put it in other words, damage which is general in relation to a contract of one
kind may be classified as special in relation to another.”  Kerr S.S. Co. v.
Radio Corp. of Am., 157 N.E. 140, 141 (N.Y. 1927) (also noting that damages
for delay may be direct in some instances and consequential in others); see
Rexnord Corp. v. DeWolff Boberg & Assocs., Inc., 286 F.3d 1001, 1004 (7th
Cir. 2002) (Posner, J.) (stating that common law “distinguishes between direct
and consequential damages, the difference lying in the degree to which the
damages are a foreseeable (that is, a highly probable) consequence of a
breach”); Computrol, Inc. v. Newtrend, L.P., 203 F.3d 1064, 1071
n.5 (8th Cir. 2000) (“We are not convinced that the [contract’s] restriction on
‘special, incidental, or consequential damages,’ standing alone, precludes the
recovery of lost profits . . . .  [I]t is incorrect to classify mechanically .
. . lost profits . . . as consequential damages.”).  If the language of the
contract indicates that the parties contemplated lost profits as the probable
result of the breach, then those lost profits are more properly seen as a part
of the contract, itself, and thus a form of direct damages.  Viastar Energy,
LLC v. Motorola, Inc., No. 1:05-CV-1095-DFH-WTL, 2006 WL 3075864, at *5–6 (S.D.
Ind. Oct. 26, 2006); see also White & Summers, Uniform Commercial
Code § 10-4 (Update 2011) (noting that it is a “fallacy” to assume that damages
to a buyer, such as those resulting from delay, are inherently consequential,
since damages that are consequential under one contract may be direct or
ordinary under another); 11 Corbin on Contracts § 56.6 (2005) (noting courts’
difficulty in establishing a workable distinction between general and special
damages, and observing that the appropriate distinction of claimed damages
varies with the context).  Even under the UCC, it has been noted that
consequential damages under § 2.715(2) may overlap with difference in value
damages recoverable under § 2.714(2).  White & Summers, Uniform Commercial
Code § 10-4.[20]  

          Lost
profits may be either “direct” or “consequential” damages, depending on their
nature.  Cherokee Cnty., 305 S.W.3d at 314; Mood, 245
S.W.3d at 12; Cont’l Holdings, Ltd. v. Leahy, 132 S.W.3d 471, 475 (Tex.
App.—Eastland 2003, no pet.).  As Chrysler argues, profits lost on other
contracts or relationships resulting from the breach (such as resale of
property to a third party) are generally classified as indirect or
consequential damages.  See Mood, 245 S.W.3d at 12; Leahy,
132 S.W.3d at 475.  However, lost profits that represent the
benefit-of-the-bargain measure of damages required to restore the plaintiff to the
economic position he would have enjoyed if the contract had been performed are “direct”
damages when shown to be “conclusively presumed” to have been foreseen by the
parties as a usual and necessary consequence of a breach.  See Cherokee Cnty.,
305 S.W.3d at 314.

C. 
Analysis

          1. 
Relevant Contractual Language

          In
relevant part, the limitation-of-damages provision in the AESSA states:

In the event of
default under this Agreement, the sole liability of the defaulting party is
payment of the other party=s out-of-pocket expenses that cannot
be mitigated. 
Both [Manuel] and [Chrysler] waive all rights to other compensatory damages
or to consequential or punitive damages under any theory of law or cause of
action.  [Emphasis added.]

          The
Settlement Agreement, to which the AESSA is attached as “Exhibit A,” also
contains a limitation-of-damages provision, which states as follows:

[Manuel] and
[Chrysler] waive any claims they may have for incidental or consequential
damages, for punitive or exemplary damages, and for jury trial, that may
arise by virtue of any breach of this [Settlement] Agreement or the AESSA,
or by virtue of any transaction based in whole or in part upon a provision of
this [Settlement] Agreement or the AESSA.  The parties remain liable
for any actual damages. [Emphasis added.]

          The
Settlement Agreement also provides that

[t]his [Settlement]
Agreement is not part of the Sales and Service Agreement of any dealership. 
The terms of any Sales and Service Agreement prevail if there is any conflict. 
To the extent that there is any conflict between this [Settlement] Agreement
and any other agreement or document other than a Sales and Service Agreement
between [Chrysler] and [Manuel], the terms of this [Settlement] Agreement
prevail.  [Emphasis added.]

          2. 
Agreements Must Be Construed Together

Chrysler
first contends that only the limitation-of-damages provision in the AESSA
(limiting Manuel’s recovery solely to “out of pocket expenses that cannot be
mitigated”) applies because the trial court found that Chrysler failed to use
its best efforts and only the AESSA contains a “best efforts” clause.[21] 
But Manuel replies that the Settlement Agreement must be considered together
with and applies to any breach of the AESSA and further states that the
Settlement Agreement prevails over the AESSA in the event of a conflict, meaning
the trial court correctly awarded damages pursuant to the Settlement Agreement’s
limitation-of-damages provision, which provides that “[t]he parties remain
liable for any actual damages.”

Chrysler
does not challenge the trial court’s finding that the Settlement Agreement and
the AESSA “comprise the entire agreement between the parties.” That finding
mirrors &3(l)
of the AESSA, which states that “[t]his Agreement, together with the [Settlement
Agreement] executed contemporaneously with this agreement, is the entire
Agreement between [Manuel] and [Chrysler].”  The Settlement Agreement refers to
and describes the purpose of the AESSA to “allow Manuel to apply to the State
of Texas for permission to establish a Chrysler, Plymouth, and Jeep Dealership
in Tarrant County, within the Dallas Market at the location set forth in
Exhibit A [the AESSA].”

The
Settlement Agreement contains numerous other references to the AESSA.  And significantly,
the limitation-of-damages provision in the Settlement Agreement also states
that it applies to “any claims for damages by virtue of any breach of this
[Settlement] Agreement or the AESSA.” [Emphasis added].  Finally, the
Settlement Agreement provides that, to the extent of any conflict with any
other agreement (other than a Sales and Service Agreement, not at issue here),
which would include the AESSA, “the terms of this [Settlement] Agreement
prevail.”  [Emphasis added.]

We
agree with Manuel that the two agreements must be construed as one instrument
and interpreted together.  Although the AESSA limits Chrysler’s liability for
breach of that agreement to “out-of-pocket expenses that cannot be mitigated,”
the Settlement Agreement states that it applies to any breach of that agreement
or the AESSA, that it prevails to the extent of any conflict with the
AESSA, and that “[t]he parties remain liable for any actual damages.”  [Emphasis
added.]

          3. 
Lost Profits May Be Direct or Consequential Damages

          There
is no bright-line rule that lost profits always constitute consequential
damages under the common law (as Chrysler seems to contend), and Chrysler’s
cases holding that lost profits are consequential damages are not persuasive. 
For example, Tooke v. City of Mexia, 197 S.W.3d 325, 329 (Tex. 2006), did
not involve common law consequential damages but instead interpreted section
271.153 of the Texas Local Government Code, which limits recovery to the “balance
due and owing” under a contract with a city plus interest, thereby excluding recovery
under that statute for all lost profits as consequential damages.[22]

          In
Leahy, 132 S.W.3d at 475, also relied upon by Chrysler, the limitation-of-damages
provision expressly excluded recovery for “lost profits,” both direct or consequential. 
Neither the AESSA nor the Settlement Agreement in this case even mentions “lost
profits,” nor do the limitation-of-damages provisions purport to allocate that
risk to either party, even though the lost profits were the only type of
damages that Manuel would likely suffer from a significant delay caused by a
protest from another dealer and that very risk was expressly mentioned in the
Settlement Agreement and addressed by both the Settlement Agreement and the
AESSA.  Courts have construed limitation-of-damages clauses to preclude both
direct and consequential lost profits where the clauses expressly waived
damages for either lost profits or consequential damages, but have held that
direct lost profits were not precluded where only “consequential” damages,
either generally or “including” lost profits, were waived.  Compare id.
(limitation-of-liability clause precluded both direct and consequential lost
profits where contract waived damages for “loss of profits, loss of business,
or any other indirect or consequential damages” (emphasis added)), with
Cherokee Cnty., 305 S.W.3d at 314 (holding direct lost profits recoverable
although contract disallowed “consequential” damages), and Tenn. Gas,
2008 WL 3876141, at *6–8 (holding clause limiting recovery of consequential
damages “including . . . lost profits” barred only consequential lost profits).[23]

          The
recent Cherokee County case supports recovery of lost profits for
resale to third parties as direct damages in the face of a
limitation-of-damages clause, similar to the one in this case, which waived
recovery of consequential damages without mentioning lost profits.  See
305 S.W.3d at 315.  In that case, a long-term contract for purchase of gas to
operate a cogeneration facility contained a provision allowing the buyer to use
the gas to operate the facility or to resell the gas to third parties.  Id.
at 311.  When the seller failed to deliver the required volumes of gas as the
claimed result of weather disruptions, the buyer sued for damages based on the
difference between the amount it would have to pay under the contract and the
much higher amount that it would have received by selling the gas to third
parties during that period.  Id. at 311–12.  The seller contended that
the damages amounted to lost profits waived by the clause prohibiting recovery
of consequential damages, and the trial court granted summary judgment to the
seller.  Id. at 312.  The Houston Fourteenth Court of Appeals reversed
and remanded, holding that the lost profits from the buyer’s inability to
resell gas not delivered to customers at the higher market value were “direct”
damages not precluded by the waiver of “consequential” damages contained in the
contract.  Id. at 314–15.  Holding that the contract was not a sale of
goods controlled by the UCC, the court used the common law definition of
“consequential damages” and held that, by the parties’ express agreement that the
buyer could resell the gas to a third party, the contract thereby implicitly
authorized the buyer to profit from increases in the market price of the gas;
thus, any wrongful interference with that contract right “would naturally and
necessarily cause [the buyer] to suffer direct damages in the form of profits
on the [a]greement itself.”[24]  Id. at 315 &
n.11.  Thus, depending on the unique circumstances of each case, including the
specific language of the contract, lost profits may be direct or consequential
damages.

          4. 
Ambiguity Concerning Recoverable Damages

                   a. 
Conflict Concerning Recoverable Damages

          Considering
the contracts together, the AESSA limits Chrysler’s liability to out-of-pocket
expenses, but the Settlement Agreement provides that it “prevails” to the
extent of any conflict with the AESSA and states that the parties “remain
liable for any actual damages.”  The first and most obvious conflict is between
the AESSA, which limits recovery to out-of-pocket expenses and excludes
consequential damages, and the Settlement Agreement, which allows recovery for
actual damages.  The second conflict is between the retention of liability for
“any actual damages” and the waiver of consequential damages, both within the
same paragraph of the Settlement Agreement. 

          Chrysler
attempts to reconcile the obvious conflict between the limitation to “out-of-pocket
expenses” in the AESSA and the retention of liability for “actual damages” in
the Settlement Agreement by focusing on a waiver of “consequential” damages
contained in both agreements.  Chrysler argues that the lost profits damages
awarded to Manuel are barred from recovery under both agreements as “consequential
damages” because they constituted only anticipated lost income from collateral
contracts, that is, retail sales that Manuel claimed his new dealership could
have made to third parties during its first year of operation had it opened on
time.  But as discussed above, lost profits are not per se consequential
damages solely because sales to third parties are involved.  See, e.g.,
Cherokee Cnty., 305 S.W.3d at 314–15.

          Chrysler
also posits that one measure of direct “actual damages” is “out-of-pocket
expenses” and that interpreting the retention of liability for “actual damages”
so as to allow Manuel’s recovery only of out-of-pocket expenses (by reason of
the waiver of consequential damages) is consistent with the limitation of
damages in the AESSA to out-of-pocket expenses.  While this proposed
construction superficially harmonizes the two clauses, the limitation-of-damages
clause in the AESSA already uses the term “out-of-pocket expenses.”  It is not
reasonable to interpret both terms, that is, “actual damages” and
“out-of-pocket expenses,” to have the same meaning as that would render one or
the other term meaningless or redundant.  See Cmty. Improvement Ass’n of
Lake Conroe Hills, Inc. v. Beckham, No. 07-03-00036-CV, 2004 WL 2000666, at
*4 (Tex. App.—Amarillo 2004, no pet.) (mem. op.) (declining to interpret
different words used in document to have the same meaning, effectively
rendering one or the other redundant); Cherokee Water Co. v. Freeman, 33
S.W.3d 349, 354 (Tex. App.—Texarkana 2000, no pet.) (holding that construing
different terms to have same meaning would render some words to be meaningless);
see also Penncro Assocs., Inc., 499 F.3d at 1157 (“When a
contract uses different language in proximate and similar provisions, we
commonly . . . assume that the parties’ use of different language was intended
to convey different meanings.”).  Thus, we must assume that the use of the term
“actual damages” rather than “out-of-pocket expenses” in the Settlement
Agreement was for a purpose and means something other than “out-of-pocket
expenses.”

          Chrysler
next argues that reading the limitation of damages clause in the Settlement
Agreement so that the more specific waiver of consequential damages controls
over the more general term “actual damages” leads to a conclusion that the
parties intended to retain liability only for actual damages that are
not incidental or consequential, meaning direct damages may be recovered but
that Manuel’s lost profits are unrecoverable consequential damages.  Chrysler
cites Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133–34 (Tex. 1994) for
the secondary rule of construction that specific provisions control over
general provisions.[25]  But Forbau further
states that “[t]his is but an application of our long-established rule that ‘[n]o
one phrase, sentence, or section [of a contract] should be isolated from its
setting and considered apart from the other provisions.’”  Id. (quoting Guardian
Trust Co. v. Bauereisen, 132 Tex. 396, 403–05, 121 S.W.2d 579, 583 (1938)). 
And it bears repeating that lost profits are not per se consequential damages
solely because there will be a subsequent sale to third parties.  See, e.g.,
Cherokee Cnty., 305 S.W.3d at 314–15.

          Chrysler’s
proposed interpretation—that the more specific waiver of consequential damages
controls over the more general term “actual damages,” meaning Manuel may only
recover lost profits that are “direct damages”—is reasonable.  But this does
not end our analysis because Chrysler’s interpretation is not the only
reasonable interpretation of the agreements.  Manuel contends that the two
agreements are ambiguous because they conflict on their face when read
together.[26]  Specifically, Manuel points
out that the Settlement Agreement expressly provides that it “prevails” in the
event of a conflict with the AESSA and that the Settlement Agreement’s
limitation of damages provision expressly states that it applies to a breach of
the AESSA.  Manuel also points to the inherent conflict between the Settlement
Agreement’s purported waiver of consequential damages and simultaneous
retention of liability for any actual damages.  Given these conflicts
and the provisions in the AESSA that time was of the essence and that Chrysler
had the obligation to use its best efforts to litigate or settle any protest so
that the South Arlington dealership could open by January 1, 2001, Manuel’s
interpretation of the agreements—preserving the right to recover any
actual damages—is also reasonable.

          After
applying the applicable rules of interpretation and considering all of the
circumstances surrounding the execution of the agreements; the lack of specific
waiver of lost profits in either agreement; and the lack of any definition of
consequential, compensatory, or actual damages, we are left with terms that
remain subject to more than one reasonable interpretation.  They are therefore
ambiguous as a matter of law, and we hold that the trial court did not err by
implicitly finding that the contracts are ambiguous.

                   b. 
Evidence of Parties’ Intent

While
the trial court did not make an explicit conclusion of law that the contract
was ambiguous, it implicitly did so because it made a finding of fact that the
parties “intended to retain the right to actual damages.”  Chrysler argues in
the last part of its second issue that there is no evidence to support the
trial court’s finding of the parties’ intent because no witness provided parol
evidence of the parties’ intent concerning the damage waiver provisions since
neither Manuel’s attorney nor Chrysler’s attorney—the only persons who drafted
or negotiated wording changes in the agreements—were asked any questions on
this topic and because no changes were made in the damage limitations in the agreements.

Chrysler
provides no case law stating that parol evidence of the parties’ true intent as
an issue of fact is required when a contract is ambiguous.  Rather, the
rule is that parol evidence of intent of the parties may be considered
when the court has determined that a contract is ambiguous.  Philadelphia Am.
Life Ins. Co. v. Turner, 131 S.W.3d 576, 587 (Tex. App.―Fort Worth
2004, no pet.) (citing Nat’l Union Fire Ins. Co. v. CBI Indus., Inc.,
907 S.W.2d 517, 520 (Tex. 1995), and Sage St. Assocs. v. Northdale Constr.
Co., 863 S.W.2d 438, 445 (Tex. 1993)).  The primary and best evidence of
the parties’ intent remains the agreement itself, considered in light of all of
the surrounding facts and circumstances.  See Emerald Tex., Inc. v. Peel,
920 S.W.2d 398, 402 (Tex. App.—Houston [1st Dist.] 1996, no writ) (citing City
of Pinehurst v. Spooner, 432 S.W.2d 515, 518 (Tex. 1968)).  The fact finder
may consider other evidence that may be helpful in illuminating the parties’
true intent.  Sw. Airlines Co. v. Jaeger, 867 S.W.2d 824, 829–30 (Tex.
App.—El Paso 1993, writ denied), disapproved of on other
grounds by Dallas Market Ctr. Dev. Co. v. Liedeker,
958 S.W.2d 382, 386–87 (Tex. 1997), overruled, Torrington Co. v. Stutzman,
46 S.W.3d 829, 840 n.9 (Tex. 2000).  Moreover, parties do not ordinarily
contract with reference to what happens if there is a breach.  “Parties
generally have their minds addressed to performance of contracts―not to
their breach or the consequences which will follow a breach.”  See 24 R.
Lord, Williston on Contracts § 64:15 (4th ed. 1999).

          In
this case, there is legally sufficient evidence to support the trial court’s
finding that the parties intended to retain the right to actual damages, even
though there is not specific testimony of their subjective intent regarding the
limitation of damages provisions.  That evidence included the agreements
themselves; the circumstances surrounding Chrysler’s planning, negotiations,
and implementation of Project 2000; the sophistication and longstanding
relationship of the parties; the parties’ negotiations; Chrysler’s need for
franchised dealers to be able to sell Chrysler’s motor vehicles to the public;
the purpose of the agreement for a franchise, which was for both Chrysler and
Manuel to make profits from car sales; the overriding importance to success of
the marketing plan such that each participating dealer agreed to waive the
right to protest another dealer; and, finally, the recognition by both parties
that a protest might nevertheless be made and result in significant delay in
opening the new dealership.[27]

          Chrysler
agreed in the AESSA to grant a franchise to Manuel, and the AESSA specifically
set forth Chrysler’s “planning potential” for Manuel’s new dealership as 1,076
vehicles to be supplied by Chrysler in the new dealership’s first year so that
Manuel could resell those vehicles to consumers.  As
conditions required for Chrysler to grant Manuel the franchise, Manuel was to
acquire suitable land for the construction of the dealership and provide
building and site plans to be approved by Chrysler for a facility—the minimum
requirements for which were specifically set forth (excluding a body shop) in
the AESSA as 20,350 square feet of facility including a new vehicle showroom
for six vehicles, a parts department of 5,500 square feet, a service department
of 11,500 square feet with 22 service stalls, and 110,100 square feet of total
land area.  The AESSA stated these requirements were based upon Chrysler’s “planning
potential” of “1076 units” for the first year of operation of the dealership.  Additionally,
in November 2001, Chrysler prepared for Manuel a “Dealer Agreement Portfolio”
including a document signed by Manuel and titled “DAP-3,” which forecast the
new dealership’s net profit as $702,674 for its first year of actual operation based
upon Chrysler’s estimated “planning potential” for the new dealership’s first
year of actual operation along with parts and service, minus expenses.

          Jim
Dimond, Chrysler’s national market representation manager in 2000 and whose department
developed Project 2000, testified his department determined dealer planning
potential.  Chrysler purchased data on auto registrations from all parts of the
country, demographic data with population and income levels, and counts of
competitive dealers in market areas.  Dimond explained that “planning
potential” is each market’s share of “forward looking financial volumes.”  As Dimond
noted, the AESSA cautioned that planning potential was not intended to predict
the number of units that the dealer would sell or that Chrysler would sell to
the dealer and that number might change with market conditions.  Nevertheless,
he admitted that Chrysler used planning potential for the number of anticipated
sales for the first year for a new franchised-dealership because it is “the
best number if we have no track record.”

          Dimond
described the South Arlington area as a growing market with a strong population
and increasing income where Chrysler needed to establish more “points.”  Dimond
explained that the only way that a dealer can sell cars in the United States
and the only way a manufacturer can distribute cars for sale to consumers is
through a franchised dealership.  As relevant here, the TMVC defines a “franchise” as one or more contracts
between a franchised dealer as franchisee and a manufacturer (or distributor)
as franchisor, in which: “(A)
the franchisee is granted the right to sell and service new motor
vehicles manufactured or distributed by the franchisor or
to service motor vehicles under the
contract and a manufacturer’s warranty” and
“(D) the franchisee’s business substantially relies on the franchisor for a
continued supply of motor vehicles,
parts, and accessories.”  Tex. Occ. Code Ann. § 2301.002 (West 2008).

          Van
Gray, Chrysler’s national dealer placement manager in 1998 and 1999, testified
that Chrysler would not have undertaken the risky venture of slating a new
dealership in the South Arlington area unless it thought the dealership could
make money.  It belabors the obvious to say that Chrysler and Manuel were
sophisticated parties in the automobile business and, as reflected by the
agreements, that both knew a protest from another dealer was possible and could
result in significant delay.  But the AESSA placed the obligation to use best
efforts to litigate or settle the protest on Chrysler (requiring only that Manuel
cooperate with Chrysler) and provided that time was of the essence, and
Manuel’s actual damages could be no other than the profits he lost by reason of
the delay caused by Chrysler’s failure to use its best efforts to litigate or
settle the Meador protest.[28]

          Considering
the evidence favorable to the trial court’s finding concerning the parties’
intent if a reasonable factfinder could and disregarding evidence contrary to
the finding unless a reasonable factfinder could not, we hold that legally
sufficient evidence supports the trial court’s finding that the parties
intended to retain liability for the damages awarded to Manuel in this case.  See
Cent. Ready Mix Concrete Co., 228 S.W.3d at 651; City of Keller,
168 S.W.3d at 827.  There was ample evidence from which the trial court could
reasonably have found that the parties intended to allocate the risk of delay
from any protest to Chrysler such that it was to retain liability for “any actual
damages” including Manuel’s lost profits, rentals, or salary resulting from
such a delay.  We therefore overrule Chrysler’s second issue.

V. 
RELIABILITY OF EXPERTS

By
its third issue, Chrysler contends that the trial court abused its discretion
in admitting the testimony of Allen Wilkerson, Manuel’s CPA, and Dr. James
R. Vinson, Manuel’s economist, regarding “lost profits” of the new dealership
in this case because both experts’ opinions were based upon an unreliable methodology
and foundation.  Chrysler characterizes the testimony and opinions as falling
into the “scientific testimony arena” subject to its Daubert/Robinson
challenge and running objection to the testimony at trial.  See Daubert v.
Merrell Dow Pharm., Inc., 509 U.S. 579, 592–93, 113 S. Ct. 2786, 2796
(1993); E.I. duPont de Nemours & Co. v. Robinson, 923 S.W.2d 549,
556 (Tex. 1995).

          For
Manuel’s primary damage model, his experts determined lost profits from the
South Arlington dealership’s delay in opening from November 2001 to November
2002 based upon actual data from Manuel Dodge (the Richardson dealership) for
that period.  Vinson referred to the damages model as the “business plan model,”
which he said is accepted in the industry for financing and venture capital for
projected profitability and which has been relied upon in other Texas cases.

          Vinson
testified that he asked Wilkerson to use Chrysler’s online manual for the
specific criteria per unit and the Richardson dealership’s actual records
during the same period regarding actual profits and expenses as a “yardstick,” which
he testified was the most comparable business to the South Arlington dealership
because it was, like the South Arlington dealership, also a two-line dealership
(after Manuel ceased selling the Chrysler line) that was actually in operation
during that period, located in a similar area with similar demographics, and was
under the same ownership and management.

          Vinson
chose the figure of 1,076 new units because Chrysler calculated that number as
the “planning potential” for anticipated sales from that dealership for 2001 as
a performance guideline based on Manuel’s historical experience of operating at
or near Chrysler’s planning potential.  Wilkerson performed the calculations
comparing the proposed South Arlington dealership and the Richardson
dealership, and he testified that the “adjusted forecasted income loss” to the
South Arlington dealership, because it was not open during 2001, was $864,468.  Wilkerson
also testified that Manuel would have, in addition, personally earned an
owner’s salary of $475,632 and collected rent paid to him by the dealership
entity in the amount of $600,000.  Thus, Manuel’s total net profit according to
Vinson and Wilkerson would have been $1,940,100 for the period that he could
not open the South Arlington dealership.

Chrysler
challenged the admissibility of the testimony of both experts as being based
upon an unreliable foundation and methodology, contending that:  (1) their damage
model was not an acceptable methodology for calculating lost profits; (2) neither
witness considered actual sales of the new dealership after it finally opened in
2002; (3) nor did they consider other comparable dealerships in the area but
instead used as their “benchmark” Manuel’s own most successful dealership from a
different market for a “shining star year” of sales; (4) they relied upon
Chrysler’s “planning potential” for 2001 to estimate future sales and did no
independent market or demographic analysis; (5) they failed to include start-up
costs for the new business; and (6) they used estimates of Dodge sales to formulate
opinions on Chrysler/Jeep sales.

A.  Reliability
Test

          We
do not regard the Robinson test for reliability of scientific opinions
to be applicable to the expert opinions in this case.  Instead, we hold that
the general reliability test of Gammill is more appropriate.  Compare
Robinson, 923 S.W.2d at 556 (relying on Daubert and identifying six
nonexclusive factors for determining whether scientific evidence is reliable),
with Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 726 (Tex.
1998) (holding factors listed in Daubert and Robinson cannot be
applied to all expert testimony, but general requirements of Texas Rule of
Evidence 702 for reliability still require trial court to determine whether
testimony is supported by more than credentials and ipse dixit of expert
and to ensure that opinion comports with
applicable professional standards and has a reliable basis in the knowledge and
experience of the discipline); see also Paschal v. Great W. Drilling, Ltd.,
215 S.W.3d 437, 448 (Tex. App.—Eastland 2006, pet. denied) (holding Gammill
test appropriate for expert testimony of a certified public accountant
regarding analysis of financial records for tracing of embezzled funds).

B.  Methodology

          Chrysler
argues that the method utilized by Vinson for determining lost profits was
improper.  Chrysler’s own expert, however, did not testify that the methodology
used by Manuel’s experts was improper, nor did he propose another method or
calculate or offer an opinion as to what the actual sales for 2001 would have
been for the twelve months that the South Arlington dealership was not open.  See
KMG Kanal-Muller-Gruppe Deutschland GMBH & Co. v. Davis, 175 S.W.3d
379, 396 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding testimony of
expert with doctorate in economics, who taught a university course in corporate
evaluation and whose method of business valuation was not shown to have been
rejected by any authority or opposing expert, was reliable under Gammill).

          There
is no one proper method for determining lost profits as damages.  See
Formosa Plastics Corp. USA v. Presidio Eng’rs & Contractors, Inc., 960
S.W.2d 41, 50 (Tex. 1998) (noting that supreme court was “not retreating from
our refusal to endorse one method for determining lost profits”) (citing Holt
Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 85 (Tex. 1992)).  The  “yardstick”
method used by Vinson, consisting of a study of profits from business
operations that are closely comparable to that of a plaintiff, has been
accepted for calculating lost profits and, in particular, for new businesses.  See
Lehrman v. Gulf Oil Corp., 500 F.2d 659, 667 (5th Cir. 1974) (recognizing
“yardstick” and “before and after” as two generally recognized methods of
determining lost profits as damages).  Texas courts have accepted the yardstick
analysis specifically for determining lost profits from a new business by using
a comparable established business that is also owned and operated by the
plaintiff, as in this case.  See, e.g., Signal Peak Enters. of Tex.,
Inc. v. Bettina Invs., Inc., 138 S.W.3d 915, 925 (Tex.
App.—Dallas 2004, pet. struck) (holding expert opinion proper for lost profits
based on projected revenues minus projected operating expenses for plaintiff’s own
existing business); America’s Favorite Chicken Co. v.
Samaras, 929 S.W.2d 617, 629 (Tex. App.—San Antonio 1996, writ denied) (describing
model presented by expert as having intelligent, objective basis by taking into
account historical operations of other
franchises operated by plaintiff, potential for failure of new franchise, and other
factors including plaintiff’s experience in the industry as well as historical
data on his franchise operations); Pena v. Ludwig, 766 S.W.2d 298, 303
(Tex. App.—Waco 1989, no writ) (holding reasonableness or reliability of
methodology went to weight and not admissibility where profits of established
business of plaintiff could serve as a reliable basis for calculating lost
profits of new business; plaintiff was primarily responsible for operating both
shops and familiar with their management and financial condition, and factual
data from established business provided sound basis for probable loss to new
business).  Thus, we reject Chrysler’s assertion that the expert testimony was
unreliable because it was based on the “yardstick” method.

C.  Foundational
Data

          We
interpret Chrysler’s remaining complaints in its third issue as challenging the
underlying foundational data relied upon by Vinson and Wilkerson.  See
Merrell Dow Pharms. v. Havner, 953 S.W.2d 706, 712 (Tex. 1997) (“The
substance of the [expert’s] testimony must be considered. . . . The underlying
data should be independently evaluated in determining if the opinion itself is
reliable.”).  In this regard, Chrysler’s complaints merge with a legal
sufficiency type analysis for lost profits damages.  Once a plaintiff has
chosen a particular methodology of evaluation, “recovery of lost profits must
be predicated on one complete calculation.”  Holt Atherton, 835 S.W.2d at
85.

          The
amount of the loss must be proven by competent evidence with “reasonable
certainty” by whatever method is chosen, but the rule regarding such proof is
intended to be “flexible enough to accommodate the myriad circumstances in which
claims for lost profits arise.”  Tex. Instruments, Inc. v. Teletron Energy
Mgmt., Inc., 877 S.W.2d 276, 279 (Tex. 1994) (reaffirming Sw. Battery
Corp. v. Owen, 131 Tex. 423, 425–26, 115 S.W.2d 1097, 1098–-99 (1938)).  What
constitutes reasonably certain evidence of lost profits is a “fact intensive
determination.”  Holt Atherton, 835 S.W.2d at 85.  At a minimum,
opinions or estimates of lost profits must be based upon objective facts,
figures, or data from which the amount of lost profits may be ascertained.  Springs
Window Fashions Div., Inc. v. The Blind Maker, Inc., 184 S.W.3d 840,
884–85 (Tex. App.―Austin 2006, pet. granted, judgm’t vacated w.r.m.) (op.
on reh’g).  Where estimates are based on objective facts or data and there are
firm reasons to expect a business to yield a profit, recovery is not prohibited
simply because the enterprise is new.  Tex. Instruments, Inc., 877
S.W.2d at 280.   It is the activity that is the enterprise, and if the activity
is well-established, the fact that a newly formed entity is engaging in the
activity will not preclude recovery.  Id.

          1. 
Reliance on “Planning Potential”

          In
November 2001, before the opening of the dealership, Chrysler prepared and Mr.
Manuel signed a document introduced into evidence and referred to as a DAP-3, which
projected net profits for the first year of operation of the South Arlington
dealership based upon the number of units Chrysler estimated for anticipated
sales during the first year of actual operation.  Chrysler now says that its
estimate is “not reliable” and should not have been used by Manuel’s experts to
project sales.  However, Van Gray, Chrysler’s own national dealer placement
manager responsible for placing, planning, and relocating dealerships,
testified that planning potential is a common methodology prepared and used by
automobile manufacturers.  In a new “green field market” such as South
Arlington, it was the “best number” available to capitalize and plan a
dealership.  In an established market, he said, planning potential would be
similar to minimum sales responsibility.  Gray further testified that Chrysler
performs extensive market research as to where dealerships are to be located
and as to what the planning potentials should be.  Manuel’s experts accepted
that Chrysler had properly evaluated the market and the resulting anticipated
sales based upon data researched by its market research company, Urban
Sciences.  They testified that planning potential is consistently used as an
industry standard and concluded that it was reasonable to use the planning
potential assigned in the AESSA by Chrysler itself as the estimate for sales of
new vehicles for that year by the dealership.  Thus, the experts’ reliance on
Chrysler’s planning potential did not render their opinions unreliable.

          2. 
Comparable Dealership

          Chrysler’s
expert (1) criticized Manuel’s experts’ use of Manuel’s Richardson dealership’s
operation for 2001 as a comparable dealership by which to ascertain the new
dealership’s anticipated net profits for that year, (2) thought that Manuel’s
experts should have used subsequent actual years of operation for the new
dealership, and (3) believed that Chrysler’s number of units of 1076 was “too
high” to use as estimated actual sales for that year.  Manuel’s experts, Vinson
and Wilkerson, testified that they forecast lost profits based upon the Richardson
dealership during the same time period because it was under Manuel’s same
experienced ownership and management in the same year that the South Arlington
dealership was unable to open, because it sold two lines made by Chrysler, as
did the South Arlington dealership, and because the demographics were
comparable.  Vinson and Wilkerson testified that they chose a dealership owned
and managed by Manuel because using other dealerships would inject too many
uncertainties and extraneous variables into the comparison.  Chrysler’s dealer
placement manager, Van Gray, agreed that management by the dealer-principal is
the most important factor in the profitability of a dealership.

Additionally,
Vinson and Wilkerson testified that the Richardson dealership and Manuel’s West
Loop Dodge dealership were the only two of Manuel’s dealerships that they could
have used for the year in question.  They did not use the West Loop Dodge
dealership in Fort Worth because it sold other lines of vehicles not
manufactured by Chrysler, and it would have been extremely difficult to
separate out the expenses and revenues attributable to Chrysler vehicles.  They
did not use Manuel’s Lancaster dealership as a basis for comparison because
Manuel did not own that store during the relevant time period.

          Chrysler
also criticizes Manuel’s experts’ choice of using Manuel Dodge as its yardstick
because that dealership sold Dodge trucks, and the Dallas-Fort Worth area is
the biggest truck market in the world and more likely to be profitable for that
reason.  But Wilkerson testified that the gross profit per vehicle was within
the same range for both dealerships.  He tested the damage model by comparing
it to gross profit per unit for other area dealers doing business in 2001 and
concluded that the model was very conservative.  We hold that the experts’
reliance on the Richardson dealership as the most comparable dealership did not
render their opinions unreliable.

          3. 
Applicable time period

          Chrysler’s
argument that Vinson and Wilkerson should have used subsequent years of the
South Arlington dealership’s actual operation versus Manuel’s damage model
based on the 2001 period during which the dealership was delayed in opening was
arguably the most contentious subject of the trial as to damages.  The
dealership opened in February of 2002.  However, both Chrysler’s and Manuel’s
witnesses agreed that the years of 2000 and 2001 were exceptionally great years
for Chrysler sales in the Dallas/Fort Worth area, whereas the significant downturn
in the automobile market began in 2002, when registrations for Chrysler
vehicles declined by 20 percent and profit for all dealers fell $8.2 million. 
The downturn was continuing at the time of trial.  The South Arlington
dealership had a loss of $482,000 in 2002.  But Manuel’s experts testified that
looking at actual performance in 2002 would not accurately reflect how the
dealership would have performed in 2001.  Wilkerson testified that the
difference between actual and projected sales was $1.1 million.

Each
of these areas of contention was hotly disputed.  We cannot say that that the
trial court abused its discretion in admitting the expert testimony on this
record.  See Cooper Tire & Rubber Co. v. Mendez, 204 S.W.3d 797, 800
(Tex. 2006) (stating trial court’s determination of reliability of expert’s
opinion reviewed for abuse of discretion).  Chrysler’s own estimate, reflected
in its DAP-3 for Manuel’s South Arlington dealership’s net profit for its first
year of operation, was $702,674.  The DAP-3 listed as “fixed expenses” a salary
of $240,000 for Tommy Manuel and $540,000 in rent to him for a total of
$780,000 to Tommy Manuel, personally.  The “actual damages” of $370,668.50
awarded by the trial court were well within the range of Chrysler’s own
estimate of net profits as well as those of Manuel’s witnesses.

Moreover,
even if there was an error in admission of the expert testimony, it was
harmless.  The trial court’s finding as to damages is supported by the evidence
as to the amounts for rental and salary estimated to be paid to Mr. Manuel by
the dealership, which Vinson testified could be considered either as added to
net profit or as fixed expense.  See Springs Window Fashions, 184 S.W.3d
at 887 (holding evidence―also provided by Vinson―that significant
portion of net income was distributed to corporation’s owner as compensation
and benefits constituted evidence supporting award for lost profits for
business otherwise operating at a loss) (citing Bettius & Sanderson,
P.C. v. Nat’l Union Fire Ins. Co., 839 F. 2d 1009, 1014 (4th Cir. 1988)
(explaining concept in context of a professional corporation, which would
otherwise never be able to show lost profits because its net income for tax
purposes is usually near zero even if shareholders are earning large
incomes)).  Accordingly, we overrule Chrysler’s third issue.

VI. 
PREJUDGMENT INTEREST

In
its final judgment, the trial court awarded Manuel damages of $370,668.50 plus
prejudgment interest of $126,425.88, calculated at the per diem rate of $83.78
and representing “prejudgment interest on past damages having accrued at the
lawful rate of eight and one-quarter percent (8.25%) per annum from January 12,
2003 until the date of this judgment.”  Chrysler contends in its fourth issue that
the trial court erred in miscalculating the amount of prejudgment interest
because it used an incorrect date of accrual (180 days after the date Chrysler
received the first of two notices of a claim on July 16, 2002), incorrectly
granting Manuel more than $35,000 in unearned prejudgment interest.

For
a breach-of-contract claim, prejudgment interest begins to accrue on the
earlier of (1) 180 days after the date a defendant receives written notice of a
claim, or (2) the date suit is filed.  Johnson & Higgins of Tex., Inc.
v. Kenneco Energy, Inc., 962 S.W.2d 507, 532 (Tex. 1998).  A claim “is a demand
for compensation or assertion of a right to be paid.”  Toshiba Mach. Co.,
Am. v. SPM Flow Control, Inc., 180 S.W.3d 761, 785 (Tex. App.—Fort Worth
2005, pet. granted, judgm’t vacated w.r.m.).  A claim need not demand an exact
amount or list every element of damage.  Id.  “The
abuse of discretion standard applies to the trial court’s factual findings as
they relate to prejudgment interest; but the de novo standard applies to the trial
court’s application of the law to the facts.”  Id.; see also Figueroa
v. Davis, 318 S.W.3d 53, 66 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

Chrysler
does not contest the trial court’s finding of fact that Chrysler received two
written notices from Manuel, one on July 16, 2002, and the other on May 31,
2004.  Chrysler’s contention is that the first time it had notice of any claim
against it for damages for breach of the AESSA or Settlement Agreement was
Manuel’s May 31, 2004 demand letter and that the July 16, 2002 written notice was
for an entirely different claim on which Manuel did not prevail in the trial
court.  Therefore, Chrysler argues that the written notice of that other claim
cannot constitute the date from which prejudgment interest was to run.

In the
July 16, 2002 letter, Manuel asserted that Chrysler had orally agreed at the June
14, 2000 strategy meeting to dismiss its appeal in federal court and attempt to
negotiate a settlement with Meador while Manuel sued Meador in state court for
damages as a result of Meador’s protest and that the Chrysler representatives
present at the meeting “unanimously agreed” to reimburse Manuel for Manuel’s
legal fees and expenses.

Pursuant
to the alleged agreement reached at the meeting, Manuel filed suit against
Meador in Tarrant County District Court on July 12, 2000.  Manuel continued the
state court suit against Meador to a conclusion, claiming breach of contract,
fraud, and promissory estoppel, and seeking damages for lost profits, lost
income, loss of opportunity, rental and salary.[29]
 Manuel eventually agreed to submit the case against Meador to binding
arbitration, pursuant to which a take-nothing judgment was rendered against
Manuel in June 2002.

Tommy
Manuel testified that he hand-delivered a brown envelope to the Dallas zone
manager containing his letter demand of July 16, 2002, together with documents
consisting of hourly billings by Manuel’s attorney and his expert in that case,
for reimbursement by Chrysler of his attorney’s fees and expenses incurred in
connection with his state court litigation against Meador.  Chrysler denied any
such agreement to reimburse Manuel for attorney’s fees and expenses in the
state court litigation.  After a series of discussions and repeated oral
demands by Manuel to Chrysler representatives, Chrysler notified Manuel by a
February 26, 2004 letter that Chrysler would not meet the demand for the
attorney’s fees and expenses.[30] 

The second
demand letter of May 21, 2004, which Chrysler contends constitutes the only
“written notice” of Manuel’s claim against Chrysler, reiterated Manuel’s claim
that Chrysler had agreed to pay his attorney’s fees and expenses in prosecuting
the suit in state court against Meador.  But the second letter also made demand
for payment of the damages that Manuel had sustained as the result of the delay
in opening the South Arlington dealership, including lost profits.

Manuel
relies upon Johnson & Higgins of Tex., Inc. v. Kenneco Energy,
Inc., in which the supreme court held that a stand-still agreement tolling
the running of limitations for filing of a suit against Johnson & Higgins
pending resolution of other litigation, rather than a later formal DTPA demand
letter, was sufficient written notice of a claim against Johnson & Higgins
for purposes of accrual of prejudgment interest.  See 962 S.W.2d at 531.
 In particular, Manuel cites language of the court noting that at the time of
the stand-still agreement, Johnson & Higgins had sufficient information to
obtain a settlement without incurring any prejudgment interest and that it was
not necessary that the document give specific notice to the other party, so
long as it demands compensation or asserts a right to payment.  See id.  Manuel
argues that the July 16, 2002 letter similarly sufficiently asserted his right
to payment and points to the documents attached to that letter, which he
describes as including documentation of other damages, including lost profits,
as well as attorney’s fee statements and expert witness expenses.  He also
refers to testimony of a Chrysler representative about possible settlement
options with Manuel, including damages of over two million dollars based upon
that witness’s own review of the July 16, 2002 demand letter.

          We
do not find Johnson & Higgins to be analogous to this case for several
reasons.  First, the standstill agreement and the later DTPA letter in that case
involved the same claim against Johnson & Higgins, not two separate claims
as in this case.  Secondly, the other litigation was ongoing at the time the
standstill agreement was entered into and arose from the same occurrence, so
that Johnson & Higgins had ample notice of the nature of the claim. 
Thirdly, as the supreme court pointed out, the “standstill agreement plainly
says that ‘Kenneco asserts that, to the extent underwriters are found not to be
liable [in the federal action] . . . , J & H is liable to Kenneco for the
amounts which Kenneco has claimed under the Policy.”  Through the specific
language of the standstill agreement, itself, it was clear that Kenneco was
asserting a right to be paid for the same amounts claimed in the federal suit. 
Thus, Johnson & Higgins had sufficient information at that time to obtain a
settlement without incurring any prejudgment interest at all.  See
Owens–Illinois, Inc. v. Estate of Burt, 897 S.W.2d 765, 769 (Tex. 1995) (“[A]
defendant must have notice and an opportunity to settle a claim.”).

          In
contrast, this case involved two separate claims under two different contracts
entered into, if at all, at different times and related to different occurrences
and suits.  We agree with Chrysler that the final judgment used the wrong date
from which to calculate prejudgment interest.  The subject of the letter of
July 16, 2002, used by the court as the start date is not the claim on which
Manuel prevailed, and we can find no mention in that letter or in the
accompanying documentation that can be interpreted even to suggest a right to
damages against Chrysler upon which this suit was based.  Prejudgment interest
cannot be based on an unrelated claim arising from a different alleged contract
(the alleged oral agreement of June 14, 2000), made under entirely different
circumstances (the strategy meeting of Chrysler and Manuel and their respective
lawyers), and which was not a part of the contracts that were the basis of this
lawsuit.  The May 27, 2004 demand letter for damages, which expressly
references and demands damages for breach of the AESSA and Settlement Agreement
against Chrysler, is the correct date of written notice.  The date of the later
demand letter was less then 180 days beforer Manuel filed this suit on June 9,
2004.  Therefore, the accrual date for purposes of calculating prejudgment
interest is June 9, 2004, the date on which Manuel filed this suit.  See Johnson
& Higgins, 962 S.W.2d at 532.  We sustain Chrysler’s fourth issue. 
Calculating an 8.25% rate on $370,668.50 from June 9, 2004 to May 31, 2007
gives a total of $90,985.08.  We modify the judgment to instead award only that
amount of prejudgment interest.

VII. 
ATTORNEY’S FEES

          In
his cross-appeal, Manuel contends in four issues that the trial court erred by
failing to award him trial and appellate attorney’s fees.  Chrysler responds
that the trial court did not err because Michigan law applies and does not
permit recovery of attorney’s fees for breach of contract actions, because the
AESSA prohibits recovery of attorney’s fees, and because an award of appellate
attorney’s fees is not mandatory.

          A
party can recover attorney’s fees under civil practice and remedies code chapter
38 if the claim is one listed in section 38.001, such as for breach of
contract, and if the party (1) is represented by an attorney, (2) presented his
or her claim to the opposing party or that party’s duly authorized agent, and (3)
the opposing party did not tender the just amount owed within thirty days.  See
Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001, .002 (West 2008).  If all of
the statutory elements are established and there is proof of the reasonableness
of the fees, an award of fees under section 38.001 is mandatory.  See AMX
Enters., L.L.P. v. Master Realty Corp., 283 S.W.3d 506, 516 (Tex. App.—Fort
Worth 2009, no pet.).

A. 
Trial Attorney’s Fees

          Chrysler
does not dispute whether Manuel established each of the statutory elements but
instead contends that Manuel may not recover attorney’s fees for other legal
reasons.  First, Chrysler argues that Michigan law applies and that Michigan
law does not permit the recovery of attorney’s fees in breach of contract
actions.  However, Chrysler did not file a motion or otherwise request that the
trial court take judicial notice of Michigan law until after the trial.  While
we do not hold that a motion seeking judicial notice of the law of another
state will always be untimely if filed after trial, Chrysler’s posttrial motion
was untimely in this case.  Choice-of-law matters may be waived, and we hold
that Chrysler waived its choice-of-law complaint in this case by failing to
raise the matter before trial, by failing to object to the admission of evidence
at trial concerning Manuel’s attorney’s fees, and by cross-examining Manuel’s
attorney about the segregation of attorney’s fees, all of which are
inconsistent with Chrysler’s appellate contention that Michigan law prevents
the recovery of attorney’s fees in this case.[31]  See Gen. Chem. Corp.
v. De La Lastra, 852 S.W.2d 916, 920 (Tex. 1993) (holding party waived
application of maritime law to case “by failing to object to evidence and jury
questions regarding damages which are not recoverable under maritime law”); Burlington
N. & Santa Fe Ry. Co. v. Gunderson, Inc., 235 S.W.3d 287, 290 (Tex.
App.—Fort Worth 2007, pet. withdrawn) (holding trial court permitted to presume
Texas and other state’s law similar because party failed to file motion
requesting judicial notice of other state’s law).

          Chrysler
also argues that the AESSA’s limitation-of-damages provision bars recovery of
Manuel’s attorney’s fees because it provides that the non-breaching party’s
sole remedy will be out-of-pocket expenses that cannot be mitigated.  Chrysler
reasons that Manuel waived any claims for other damages and that attorney’s
fees are incidental damages.  But Texas law provides that attorney’s fees are
more in the nature of costs than damages.  See, e.g., Alma Grp.,
L.L.C. v. Palmer, 143 S.W.3d 840, 846 (Tex. App.—Corpus Christi 2004, pet.
denied); see also Heliflight, Inc. v. Bell/Agusta Aerospace Co., LLC,
No. 4:06-CV-425-A, 2007 WL 4373259, at *2 (N.D. Tex. Dec. 12, 2007) (mem.
op.).  The AESSA does not purport to prohibit recovery of costs or attorney’s
fees in state court litigation.  Therefore, we hold that the AESSA does not
prohibit the recovery of Manuel’s attorney’s fees.

          Chrysler
next argues that the trial court properly denied Manuel’s request for
attorney’s fees because Manuel failed to segregate his attorney’s fees between
those incurred prosecuting claims for which attorney’s fees are recoverable and
those incurred prosecuting claims for which attorney’s fees are not
recoverable.  To support its contention, Chrysler relies on Green Int’l,
Inc., 951 S.W.2d at 389, in which the supreme court stated:  “A failure to
segregate attorney’s fees in a case containing multiple causes of action, only
some of which entitle the recovery of attorney’s fees, can result in the
recovery of zero attorney’s fees.”  However, this statement from Green
Int’l, Inc. has been characterized as dicta and is inconsistent with a
subsequent supreme court opinion which holds that the failure to segregate
attorney’s fees does not bar all recovery of attorney’s fees.  See Tony
Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 314 (Tex. 2006) (“Chapa’s
failure to segregate her attorney’s fees does not mean she cannot recover any.  Unsegregated
attorney’s fees for the entire case are some evidence of what the segregated
amount should be.”); see also Air Routing Int’l Corp. (Canada) v. Britannia
Airways, Ltd., 150 S.W.3d 682, 693 (Tex. App.—Houston [14th Dist.] 2004, no
pet.) (holding statement in Green concerning nonrecovery of fees for
failure to segregate is nonbinding dicta).  Under Chapa, remand is the
appropriate remedy so that Manuel may offer evidence of the segregated amount
of reasonable and necessary attorney’s fees.  See Chapa, 212 S.W.3d at
314.

          As
mentioned, Chrysler does not contend on appeal that Manuel failed to establish
any of the section 38.001 or 38.002 requirements, and it appears from our
review of the record that Manuel presented evidence of each statutory requirement. 
Indeed, Manuel presented evidence that reasonable and necessary attorney’s fees
in this case exceeded $480,000 through trial, with at least another $125,000
for an appeal through the supreme court.  Thus, even assuming that Manuel’s
attorney fee evidence consisted only of unsegregated fees, the trial court
erred by failing to award him any attorney’s fees.  See AMX Enters., L.L.P.,
283 S.W.3d at 516 (stating section 38.001 fee award mandatory if statutory
elements met and proof of reasonableness presented).  We therefore sustain
Manuel’s first three issues and remand this case for a new trial concerning the
segregated amount of reasonable and necessary attorney’s fees for Manuel’s
breach of contract claim.

B. 
Appellate Attorney’s Fees

          Manuel
contends in his final issue that the trial court erred by failing to award him
any appellate attorney’s fees, arguing that if an award of trial attorney’s
fees is mandatory under section 38.001, an award of appellate attorney’s fees
is likewise mandatory.  See End Users, Inc. v. Sys. Supply For End Users,
Inc., No. 14-06-00833-CV, 2007 WL 2790379, at *6 (Tex. App.—Houston [14th
Dist.] Sept. 27, 2007, no pet.) (mem. op.) (citing Lee v. Perez, 120
S.W.3d 463, 469 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (holding
appellate attorney’s fees mandatory if trial fees mandatory under section
38.001).  Chrysler, citing several cases, responds that the factfinder may
award appellate attorney’s fees but is not required to do so.  See Anderson,
Greenwood & Co. v. Martin, 44 S.W.3d 200, 221 (Tex. App.—Houston [14th
Dist.] 2001, pet. denied); see also Hunsucker v. Fustok, 238 S.W.3d 421,
431 (Tex. App.—Houston [1st Dist.] 2007, no pet.); Clements v. Minn. Life
Ins. Co., 176 S.W.3d 258, 265 (Tex. App.—Houston [1st Dist.] 2004, no pet.),
superseded by statute on other grounds as recognized by State Farm Life Ins.
Co. v. Martinez, 216 S.W.3d 799, 804 (Tex. 2007); Neal v. SMC Corp.,
99 S.W.3d 813, 818 (Tex. App.—Dallas 2003, no pet.); Olivares v. Porter
Poultry & Egg Co., 523 S.W.2d 726, 732 (Tex. Civ. App.—San Antonio
1975, no writ).

          Although
Chrysler correctly cites the general rule that the factfinder may but is not
required to award appellate attorney’s fees, none of Chrysler’s cases
specifically addresses the scenario present here—whether appellate attorney’s
fees are mandatory when trial attorney’s fees are mandatory under section
38.001 of the civil practice and remedies code.  The Anderson court,
although it stated the general rule, held earlier in the opinion that the fee
claimant could not prevail on its contract claim, meaning there was no basis
for the recovery of any attorney’s fees.  See 44 S.W.3d at 221; cf.
Lee, 120 S.W.3d at 469 n.27 (distinguishing and declining to follow Anderson). 
Hunsucker concerned appellate attorney’s fees for an appeal of an order
dismissing a medical malpractice suit for failure to file an expert report, see
238 S.W.3d at 423–24, 431, and Clements addressed an intervenor’s attorney’s
fees under the insurance code.  See 176 S.W.3d at 265–66.  Finally, the Olivares
court rejected the appellant’s contention that appellate attorney’s fees for
breach of contract and quantum meruit claims are never recoverable.  See
523 S.W.2d at 732.

          On
the other hand, Manuel cites authority for the proposition that appellate
attorney’s fees are mandatory if trial attorney’s fees are mandatory under
section 38.001.  See End Users, Inc., 2007 WL 2790379, at *6.  In End
Users, Inc., the claimant presented uncontested evidence that $30,000 was a
reasonable fee for an appeal to the court of appeals and that $25,000 was a
reasonable fee for an appeal to the Texas Supreme Court.  Id.  Because
the evidence was uncontested, the court of appeals modified the trial court’s
judgment to award the uncontested amount of appellate attorney’s fees.  Id.

          We
agree with our sister court of appeals and hold that if an award of trial
attorney’s fees is mandatory under civil practice and remedies code section
38.001, an award of appellate attorney’s fees is likewise mandatory.  Unlike
the End Users, Inc. court, though, we cannot simply modify the trial
court’s judgment concerning the award of appellate attorney’s fees because the
evidence concerning those fees was not conclusive.  Therefore, we sustain
Manuel’s fourth issue but remand this case for a new trial concerning the
amount of Manuel’s reasonable and necessary appellate attorney’s fees.  See
World Help v. Leisure Lifestyles, Inc., 977 S.W.2d 662, 684 (Tex. App.—Fort
Worth 1998, pet. denied) (remanding for consideration of appellate attorney’s
fees when evidence not conclusive).

VIII. 
CONCLUSION

          Having
overruled Chrysler’s first three issues and having sustained Chrysler’s fourth
issue, we affirm as modified the portion of the trial court’s judgment awarding
damages to Manuel and affirm as modified the prejudgment interest awarded to
Manuel.  In addition, having sustained each of Manuel’s four issues, we reverse
the portion of the trial court’s judgment awarding no attorney’s fees to Manuel
and remand this case to the trial court for a new trial concerning the amount
of Manuel’s reasonable and necessary trial and appellate attorney’s fees.

 

ANNE GARDNER
JUSTICE

 

PANEL: 
GARDNER and WALKER, JJ.; and DIXON W. HOLMAN (Senior Justice, Retired, Sitting
by Assignment).

 

DELIVERED:  February 24,
2012









[1]Tommy J. Manuel; Tommy
Manuel Chrysler-Jeep, Inc.; and Manuel Dodge, Ltd. were plaintiffs in the trial
court.  During the pendency of this appeal, Tommy Manuel Chrysler-Jeep, Inc.
changed its name to Tommy Manuel Auto Leasing, Inc., and Manuel Dodge, Ltd.
changed its name to Manuel Auto Sales, Ltd.





[2]The trial court made
extensive findings of fact—twenty-nine pages’ worth.  Findings of fact that are
unchallenged are binding on an appellate court unless the contrary is
established as a matter of law or there is no evidence to support the finding. 
McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986); Raman
Chandler Props., L.C. v. Caldwell’s Creek Homeowners Ass’n, Inc., 178
S.W.3d 384, 390 (Tex. App.—Fort Worth 2005, pet. denied).  We draw the bulk of
the facts recited below from the trial court’s unchallenged findings, which
from our review of the record are supported by sufficient evidence.





[3]See Automobile
Dealers’ Day in Court Act, 15 U.S.C. §§ 1221–1225 (1956).





[4]See New Motor Vehicle
Bd. of Cal. v. Orrin W. Fox Co., 439 U.S. 96, 101–02 & n.5, 99 S. Ct.
403, 407–08 & n.5 (1978) (listing then-existing federal and state statutes
and quoting from Senate committee report as to its grave concern that the disparity
in economic power and bargaining strength had enabled manufacturers to, in
effect, write the rules by which the two parties conduct their business affairs
as set forth in the sales agreements or franchises that the manufacturer
prepares for the dealer’s signature) (quoting S. Rep. No. 84-2073, at 2 (1956)).





[5]Id. at 107–08, 99
S. Ct. at 410–11.





[6]Id.





[7]See Act of April 7,
1971, 62nd Leg., R.S., ch. 51, 1971 Tex. Gen. Laws 89.  The TMVC has been
amended almost every session since its inception.  Currently, the regulatory
function is performed by the Motor Vehicle Division of the Texas Department of
Transportation, and the substantive law is now codified as Chapter 2301 of the Texas
Occupations Code.  See, e.g., Tex. Occ. Code § 2301.001 (West 2004). 
Current sections of the occupations code referenced in this opinion correspond
to sections of the former TMVC in effect at the time of the events and suit
that remain substantially unchanged.





[8]See id. 





[9]See Tex. Occ. Code
Ann. § 2301.652 (West Supp. 2011).





[10]Id.





[11]See id. § 2301.803
(West Supp. 2011).





[12]See id. § 2301.003
(West 2004).





[13]The trial court’s
findings of fact and conclusions of law do not expressly state that Chrysler
breached the AESSA (as opposed to the Settlement Agreement), but only the AESSA
contains a best efforts clause.





[14]Manuel urges us to
summarily overrule Chrysler=s first issue, arguing that an independent basis exists
for the judgment in that the trial court could have based its breach of
contract finding on breach of paragraph 3 of the Settlement Agreement.  But the
trial court specifically found that Chrysler failed to use its best efforts to
resolve the Meador protest, a provision contained only in the AESSA.  The trial
court had also previously granted summary judgment against Manuel for breach of
the Settlement Agreement and made no finding, and none was requested, that
Chrysler failed to comply with paragraph 3 of the Settlement Agreement.  Thus,
we will consider Chrysler=s first issue on the
merits.





[15]As Manuel notes,
other Texas courts have encountered best efforts clauses in a variety of
contracts without discussion of how such a clause should be interpreted.  See,
e.g., Malatt v. C&R Refrigeration, 179 S.W.3d 152, 158 (Tex. App.—Tyler
2005, no pet.) (holding best efforts clause did not require actual sale of
machine but implying reasonable time); Aquila Sw. Pipeline, Inc. v. Harmony
Exploration, Inc., 48 S.W.3d 225, 233–34 (Tex. App.—San Antonio 2001, pet.
denied) (interpreting Section 2.306(b) of UCC, which expressly imposes a best
efforts standard upon the parties to a contract for exclusive dealing in
goods).





[16]That Chrysler agreed
to an extension of time for Manuel to establish and open the dealership when
Meador=s protest was not
resolved by that time is further indication that time was of the essence.  See
Siderius, Inc. v. Wallace Co., 583 S.W.2d 852, 864 (Tex. Civ. App.—Tyler
1979, no writ).





[17]The decision of the
federal district court to return the proceedings regarding validity of the
protest waiver to the Commission seems prescient, considering that it predated
by less than a year the legislature’s amendment of the TMVC to give the
Commission original, exclusive jurisdiction over issues regarding sale and
distribution and other issues governed by the Code and to require abatement of
a suit seeking DTPA and other damages pending an administrative determination
of Code-based issues that would govern the remainder of the case.  See
Subaru of Am., Inc. v. David McDavid Nissan, Inc., 84 S.W.3d 212, 222 (Tex.
2002) (interpreting legislature’s amendment to Section 3.01(a) of the Code, Act
of May 18, 2001, 77th Leg., R.S., ch. 155, § 5, 2001 Tex. Gen. Laws 313, 327).





[18]As mentioned above, the
trial court’s findings of fact and conclusions of law do not expressly state
that Chrysler breached the AESSA (as opposed to the Settlement Agreement), but
only the AESSA contains a best efforts clause.





[19]Out-of-pocket expenses
are reliance damages designed “to reimburse the plaintiff for expenditures made
toward execution of the contract, in order to restore the status quo before the
contract.”  See Foley v. Parlier, 68 S.W.3d 870, 884–85 (Tex. App.—Fort
Worth 2002, no pet.) (contrasting reliance or out-of-pocket damages with
expectancy or benefit-of-the-bargain damages).





[20]Despite the vast number
of cases purporting to define “consequential damages” by repeating the same
time-honored but general definitions and distinctions between consequential and
direct damages, the meaning remains elusive.  See, e.g., T.Co Metals,
L.L.C. v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 341 (2nd Cir.
2010) (citing White & Summers, Uniform Commercial Code § 10-2 (5th ed.
2006) (noting “reasonable persons often differ whether an item of damage is
‘consequential’”); Applied Data Processing, Inc. v. Burroughs Corp., 394
F. Supp. 504, 508 (D. Conn. 1975) (discussing Michigan law and stating neither
in Michigan nor elsewhere does the term “consequential damages” have a clearly
established meaning); see also Glenn D. West, Sara G. Duran, Reassessing
the “Consequences” of Consequential Damage Waivers in Acquisition Agreements,
63 Bus. Law 777, 780 (May 2008) (suggesting that few transactional lawyers can
define “‘consequential’ damages accurately and many misconstrue the impact a
waiver of such damages may have”); Gregory K. Morgan & Albert E. Phillips, Design
Professional Contract Risk Allocation:  The Impact of Waivers of Consequential
Damages and Other Limitations of Liabilities, 33 J.C. & U.L. 1,
13 (2006) (stating “no one knows what consequential damages are or may be, at
least not with predictability or uniformity”).





[21]Chrysler
intimates that the AESSA is only a letter of intent for which Manuel paid
Chrysler nothing.  But Manuel gave up his longstanding, successful Chrysler
line at his Richardson dealership (Manuel’s lost profits that he would have
received from the Richardson dealership as the result of the delay while he
waited to build and open his new dealership constituted his alternative measure
of damages) and agreed to waive his own rights to protest any other relocations
or new dealerships in Project 2000.  Moreover, Chrysler has not argued that the
AESSA was not binding, nor has it challenged the trial court’s conclusion that the
AESSA (as well as the Settlement Agreement) is valid and enforceable.  Letters
of intent may be enforceable as valid contracts where parties agree on material
terms even where they leave open other terms for later negotiation.  Foreca,
S.A. v. GRD Dev. Co., 758 S.W.2d 744, 746 (Tex. 1988) (holding intent to be
bound is essential element of enforceable agreement); John Wood Grp. USA,
Inc. v. ICO, Inc., 26 S.W.3d 12, 19 (Tex. App.—Houston [1st Dist.] 2000, pet.
denied) (noting intent to be bound by letter of intent may be found as a matter
of law).





[22]We agree with our sister
court in Cherokee County that Tooke should not be extended beyond
the governmental-immunity context.  See 305 S.W.3d at 315 n.8 (noting
that lost profits are consequential damages under local government code section
271.153) (quoting City of Houston v. Petroleum Traders Corp., 261 S.W.3d
350, 359 (Tex. App.—Houston [14th Dist.] 2008, no pet.)).





[23]See also Penncro
Assocs., Inc. v. Sprint Spectrum, L.P., 499 F.3d 1151, 1156 (10th
Cir. 2007) (holding direct lost profits allowed where clause provided “no
consequential damages are recoverable includ[ing], but . . . not limited to,
lost profits, lost revenues and lost business opportunities”).





[24]The Houston court
contrasted those direct loss of profits from inability to sell the gas with
profits lost on its contracts for sale of electricity produced from the
gas at its cogeneration facility, which would be consequential damages.  Id.
at n.12; see also Tenn. Gas, 2008 WL 3876141, at *8 (holding gas
pipeline suffered consequential damages when seller=s failure to timely deliver purchased equipment
prevented it from selling gas to its customers).





[25]Chrysler also argues that
the waiver of “other compensatory damages” (in addition to the waiver of
consequential damages) in the AESSA is more specific and controls over the more
general retention of liability for “actual damages” in the Settlement Agreement
(applying the specific-over-general rule of construction, so as to preclude
recovery of all lost profits).  But the ordinary meanings of the terms “actual
damages” and “compensatory damages” are that they are synonymous.  See Tate
v. Hernandez, 280 S.W.3d 534, 541 (Tex. App.—Amarillo 2009, no pet.)
(holding “actual damages” and “compensatory damages” have same meaning); Anderson
v. Alcus, 42 S.W.2d 294, 296 (Tex. Civ. App.—Beaumont 1931, no writ)
(noting “actual damages” are synonymous with “compensatory damages”).  Chrysler’s
only suggestion to resolve this conflict is to ignore the provision in the
Settlement Agreement allowing recovery of actual damages.  Application of that
rule of construction here would require that we simply disregard that provision
in violation of the basic rule that we avoid interpreting contracts so as to
render terms meaningless.  Second, we are at a loss to see how one synonymous
term can be more specific than another.  Third, Chrysler overlooks the
provision that the Settlement Agreement “prevails” in the event of a conflict
with the AESSA, so that the parties’ retention of liability for “actual
damages” in the Settlement Agreement trumps the waiver of “other compensable
damages” in the AESSA.





[26]Manuel, citing Wilburn
v. Mo.-Kan.-Tex. Ry. Co. of Tex., 268 S.W.2d 726, 731 (Tex. Civ.
App.—Dallas 1954, no writ) (op. on reh’g) (stating that “[a] contract will not
be construed to limit the remedial rights of the parties unless such an
intention is clear”), argues that the limitation-of-damages clauses are
ambiguous, which renders them unenforceable.  While we agree that the clauses
are ambiguous as discussed below, this rule of construction is inapplicable
here because the contracts provide that their terms will not be strictly
construed against either party.  Moreover, this rule of strict construction
does not apply in the context of commercial contracts between sophisticated
parties.  See Green Int’l, Inc. v. Solis, 951 S.W.2d 384, 387 (Tex.
1997) (holding no-damages-for-delay clause enforceable in agreement between
experienced parties familiar with such risk-shifting clauses).





[27]Moreover, a limitation or
waiver of damages in a contract is an affirmative defense, so that Chrysler,
rather than Manuel, had the burden of proof to offer any parol or other
extrinsic evidence that the parties’ true intent was to preclude recovery of
the damages claimed by Manuel.  See Leahy, 132 S.W.3d at 475; Regency
Advantage Ltd. P’ship v. Bingo Idea–Watauga, Inc., 928 S.W.2d 56, 63 (Tex.
App.—Fort Worth 1995), rev’d in part on other grounds, 936 S.W.2d 275
(Tex. 1996) (per curiam).





[28]The amount of damages
awarded by the trial court was within the range of and less than half of
Chrysler’s own estimate and, as indicated by the trial court in a letter to the
parties, amounts to approximately four months’ of lost profits.  The amount
could have tied to the four-month period, from June 7, 2000, when the federal
district court denied relief to Chrysler, to October 4, 2000, the date of
Chrysler’s ultimate settlement with Meador.





[29]Contemporaneously with
settling Meador’s protest in late September or early October 2001, Chrysler
offered to reimburse Manuel’s attorney’s fees in connection with the suit
against Meador if Manuel would immediately drop the suit against Meador, which
offer Manuel summarily rejected.





[30]Manuel did not prevail on
its claim for those attorney’s fees and expenses in this case in the trial
court and has not pursued recovery of those amounts by cross-appeal.





[31]One of our sister courts
of appeals explained this rule as follows:

A court may take judicial notice of the laws of another
jurisdiction at any point in a proceeding.  The issue of a choice-of-law
determination is distinct from the court’s power to generally take judicial
notice of a foreign state’s law.  Thus, the mere fact that the court may take
judicial notice of foreign laws does not mean that choice-of-law issues may be
raised at any point in the proceeding.  A preliminary motion is, therefore,
necessary to assure the application of the laws of another jurisdiction.  The
court may undertake a choice of law analysis sua sponte, but rule [of civil
procedure] 202 does not compel this action.

Pittsburgh Corning Corp. v.
Walters, 1 S.W.3d 759, 769 (Tex. App.—Corpus Christi 1999, pet. denied)
(citations omitted) (emphasis added).